## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LA FRONTERA CENTER, INC., an Arizona
nonprofit corporation d/b/a LA FRONTERA
NEW MEXICO,

      Plaintiff,

vs.                                                                              No. CIV 16-0187 JB/WPL

UNITED BEHAVIORAL HEALTH, INC., a
foreign corporation; UNITED HEALTHCARE
INSURANCE COMPANY, INC., a foreign
corporation; OPTUMHEALTH NEW MEXICO
foreign corporation d/b/a UNITED
BEHAVIORAL HEALTH, INC. and BLACK
AND WHITE CORPORATIONS,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion to Compel

Arbitration, filed March 31, 2016 (Doc. 3)("Motion").  The Court held a hearing on July 26,

2016.  The primary issues are: (i) whether Plaintiff La Frontera Center, Inc. entered a binding

arbitration agreement with Defendants United Behavioral Health, Inc., United Healthcare

Insurance Company, Inc., Optumhealth New Mexico d/b/a United Behavioral Health, Inc., and

Black and White Corporations (collectively "United Health"); (ii) whether the arbitration

agreement applies to all claims that La Frontera asserts against United Health; and (iii) whether

the Court should stay these proceedings pending the resolution of arbitration.  The Court

concludes (i) that La Frontera entered an enforceable arbitration agreement with United

Behavioral Health; and (ii) that La Frontera's claims against each of the United Health

Defendants are subject to mandatory arbitration.  Accordingly, the Court grants the Motion and

stays proceedings over La Frontera's claims.

**FACTUAL BACKGROUND**

This case arises from a complaint that La Frontera filed on February 9, 2016, in the Second Judicial District Court, County of Bernalillo, State of New Mexico, alleging various state law tort, contract, and restitutionary claims against United Health.  See Complaint for Fraud; Fraudulent Misrepresentation; Negligent Misrepresentation; Breach of Contract; Breach of the Covenant of Good Faith and Fair Dealing; Breach of Contract -- Intended Third-Party Beneficiary; and in the Alternative Promissory Estoppel; and Quantum Meruit/Unjust Enrichment, filed March 14, 2016 (Doc. 1)("Complaint").  On March 14, 2016, La Frontera filed in the Second Judicial District Court an amended complaint, adding claims under New Mexico's Insurance Code, N.M. Stat. Ann. §§ 59A-16-20, 59A-16-30, and New Mexico's Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 to 57-12-26.   See First Amended Complaint for Fraud; Fraudulent Misrepresentation; Negligent Misrepresentation; Breach of Contract; Breach of the Covenant of Good Faith and Fair Dealing; Breach of Contract -- Intended Third-Party Beneficiary; Violation of the New Mexico Unfair Practices Act; Violation of the Unfair Claims Practices Section; and in the Alternative, Promissory Estoppel; and Quantum Meruit/Unjust Enrichment, filed March 14, 2016 (Doc. 1-1)("First Amended Complaint").  Also, on March 14, 2016, United Health removed the action to federal court, based on diversity jurisdiction.  See Notice of Removal at ¶¶ 5-6, at 2, filed March 14, 2016 (Doc. 1)("Notice of Removal").  The Court draws the facts from La Frontera's First Amended Complaint; the Defendants' Motion; the Plaintiff's Response to Defendants' Motion to Compel Arbitration [Doc. 3], filed May 9, 2016 (Doc. 13)("Response"); and the Defendants' Reply in Support of Motion to Compel Arbitration, filed June 10, 2016 (Doc. 16)("Reply").

1.     **United Health's Statewide Contract to Provide State and Federally-Funded Behavioral Health and Substance Abuse Services in New Mexico.**

The State of New Mexico, Human Services Department ("HSD") and its sixteen-member Inter-Agency Behavioral Health Purchasing Collaborative ("Collaborative")[1] awarded United Health a contract to act as New Mexico's "Statewide Entity" to establish, operate, and manage behavioral and substance abuse services to children, families, and adults enrolled (henceforward "Enrollees") through the Collaborative's various agency programs. First Amended Complaint ¶¶ 5, at 2-3. To acquire the Statewide Entity contract, United Health represented to the Collaborative that United Health had national experience in implementing successful statewide Medicaid and state-funded programs, as well as expertise in delivering behavioral health managed care. See First Amended Complaint ¶ 23, at 7. United Health executed the Statewide Entity contract on January 22, 2009. See First Amended Complaint ¶ 19, at 6.

Under the Statewide Entity contract, United Health "agreed to implement and manage New Mexico's Medicaid and State funded programs to deliver services and pay providers for supplying behavioral health and substance abuse services to Enrollees" from July 1, 2009, through June 30, 2013. First Amended Complaint at ¶ 13, at 4. The contract also obligated

---

[1]The Collaborative is comprised of representatives of several state agencies and divisions, including:

> the secretaries of aging and long-term services; Indian affairs; human services; health; corrections; children, youth and families; finance and administration; workforce solutions; public education; and transportation; the directors of the administrative office of the courts; the New Mexico mortgage finance authority; the governor's commission on disability; the developmental disabilities planning council; the instructional support and vocational rehabilitation division of the public education department; and the New Mexico health policy commission; and the governor's health policy coordinator, or their designees.

N.M. Stat. Ann. § 9-7-6.4(A).

United Health to employ a "dedicated Statewide Contract Compliance Officer," and prohibited United Health "from assigning or delegating this key management function."   First Amended Complaint ¶ 24, at 7.   Under the contract, United Health promised to

> ensure that quality behavioral health services, including services funded by Medicaid and various State funding sources, are provided to Medicaid and non-Medicaid consumers; provider network and out-of-network providers are reimbursed timely and accurately; and that services would be delivered to promote prevention, recovery, resilience, and the efficient use of available resources.

First Amended Complaint ¶ 26, at 7.   The Statewide Entity contract recognized "that United would deliver services through subcontracted providers," but United Health undertook responsibility to fulfill all of the contract's performance requirements.   First Amended Complaint ¶ 31, at 8.   HSD, on the Collaborative's behalf, paid United Health approximately $370 million annually to perform as New Mexico's Statewide Entity.   See First Amended Complaint ¶ 13, at 4.   HSD paid United Health on the first Friday of every month based on the total number of Enrollees with United Health.   See First Amended Complaint ¶ 34, at 9.

United Health had problems with its subcontractors.   See First Amended Complaint ¶¶ 35-49, at 10-12.   Within six months of executing the Statewide Entity contract, "the Collaborative fined United $1 million for not timely paying its subcontracted providers for the services they rendered to United's Enrollees."   First Amended Complaint ¶ 35, at 10.   Moreover, in 2012, United Health learned of suspected billing errors, but United Health did not notify its subcontracted providers of these suspected billing errors.   See First Amended Complaint ¶ 37, at 10.   Nor did United Health notify the Collaborative that it had detected certain billing errors until September or October 2012.   See First Amended Complaint ¶ 37, at 10.   In December 2012, and January 2013, United Health investigated several of its subcontracted behavioral health and substance abuse providers, and identified, in a pre-audit investigation, "what United called

billing errors by its subcontracted providers during United's entire tenure as New Mexico's Statewide Entity."  First Amended Complaint ¶ 38, at 10-11.

United Health gave the Collaborative the results of this pre-audit investigation in January 2013, and the Collaborative contracted with the Public Consulting Group, Inc. ("PCG") to conduct a confidential audit of fifteen of United Health's subcontracted providers.  See First Amended Complaint ¶¶ 38-39, at 10-11.  The PCG audit concluded that United Health overpaid fifteen of its subcontracted providers $37.3 million over a three-and-a-half year period.  See First Amended Complaint ¶ 40, at 11.  "On June 24, 2013, it was publically announced that New Mexico received 'credible allegations' that 15 of United's contracted non-profit providers of behavioral health service had defrauded the program out of $36 million over a three-year period."  First Amended Complaint ¶ 40, at 11.  United Health's fraud, waste, and abuse detection and prevention system did not detect such fraud and abuse in 2009, 2010, 2011, or most of 2012, see First Amended Complaint ¶ 37, at 10, despite United Health's promise under the contract to "monitor its subcontracted providers and, when necessary, use corrective measures for (i) compliance with clinical requirements; and (ii) compliance with non-clinical claims processing regulations, rules, and policies specified in the Statewide Contract," First Amended Complaint ¶ 29, at 8.

United Health attempted to correct course by replacing its then-existing subcontractors with Arizona-based providers.  See First Amended Complaint ¶¶ 42-49, at 12-13.   First, United Health sought and received, effective September 4, 2012, a six-month extension of its Statewide Entity contract with the Collaborative, extending the contract's terms through December 31, 2013.  See First Amended Complaint ¶ 44, at 12.   Next, in October 2012, United Health represented to the Collaborative that it could "solve the institutional fraud problem" by

terminating its existing subcontractors and "substituting Arizona providers to assume wholesale management of New Mexico's behavioral health services."  First Amended Complaint ¶ 45, at 12.  HSD characterized this period as a "Behavioral Health Emergency."  First Amended Complaint ¶ 47, at 13.

> **2.     United Health and La Frontera Execute Several Participation Provider Agreements.**

In November 2012 and January 2013, United Health's Chief Executive Officer, Andy Sekel, contacted La Frontera to discuss a potential replacement of one of United Health's then-existing statewide subcontractors.  See First Amended Complaint ¶ 51, at 14.  Also, in January 2013, the HSD Director of Behavioral Health Services and the Collaborative's CEO, Diana McWilliams, contacted La Frontera to gauge La Frontera's "interest in helping New Mexico salvage its behavioral health and substance abuse delivery programs that were nearing collapse." First Amended Complaint ¶ 52, at 14.   In February 2013, representatives from United Health, HSD, and PCG met with La Frontera in Tuscon, Arizona, to discuss La Frontera's bringing its behavioral health operations expertise to New Mexico.  See First Amended Complaint ¶ 53, at 14.  La Frontera expressed concerns about expanding its operations into New Mexico, see First Amended Complaint ¶ 54, at 14-15, but "United claimed that its management expertise as the Statewide Entity and its implementation of New Mexico's fully operational statewide program would provide a seamless transition for La Frontera to assume operations of United's existing operating facilities," First Amended Complaint at ¶ 56, 15.   Moreover, "McWilliams expressed concern that the delivery of behavioral health and substance abuse services for New Mexico's most vulnerable substance abuse population of enrollees could be disrupted if La Frontera and other Arizona providers did not help out during the Emergency."  Response at 2.  La Frontera agreed to assist the Collaborative and United Health to provide care to United Enrollees, and La

Frontera formed, at its own expense, a team to organize and implement a transition into New Mexico.  See First Amended Complaint ¶¶ 57-58, at 15.  At this point -- January or February 2013 -- "neither HSD nor United/Optum had presented any proposed contract or discussed any terms or conditions of potential agreements, other than that La Frontera would take over for one or more New Mexico providers and would be paid New Mexico Medicaid rates for its services." Response at 3 (citing Affidavit of Daniel J. Ranieri, Ph.D ¶ 9, at 3 (sworn May 6, 2016), filed May 9, 2016 (Doc. 13)("Ranieri Aff.")).

On June 27, 2013, HSD and La Frontera executed "an emergency, no-bid procurement Human Service Department Professional Services Contract for La Frontera to temporarily assume responsibilities for delivering services in place of United's . . . subcontracted providers." First Amended Complaint ¶ 59, at 15.  The no-bid emergency procurement contract made La Frontera a "participating provider" under United Health's statewide contract with the Collaborative.   First Amended Complaint ¶ 62, at 16.   HSD agreed under the contract to reimburse La Frontera's start-up costs until La Frontera could directly bill United Health for services rendered to United Health's Enrollees.  See First Amended Complaint ¶ 59, at 15-16. HSD paid these start-up funds directly to United Health, which agreed to disburse them to La Frontera.  See First Amended Complaint ¶ 59, at 16.  To this end, "McWilliams had given direction to [United Health] to pay La Frontera $1,000,000 to help defray La Frontera's anticipated costs . . . associated with La Frontera's transition into facilities formerly operated by United's subcontracted providers."  Response at 3 (alterations added)(citing Ranieri Aff. ¶ 11, at 3).

During negotiations regarding the formation of a provider agreement between United Health and La Frontera, United Health represented to La Frontera that, when La Frontera

replaced United Health's then-existing subcontractors, the transition would be seamless, because

> (i) United's claims and encounter processing system would easily link to La Frontera's system to ensure lower administrative costs and timely payment; (ii) there would be onsite readily available Enrollee information; (iii) Enrollee medical records would be easily accessible onsite; and (iv) to complete the "turnkey" transition, each site would be staffed with experienced employees and fully licensed and credentialed professionals.

First Amended Complaint ¶ 72, at 19.  United Health also directed La Frontera to retain existing employees for terminated providers for at least ninety days and to ensure that all existing employees were re-credentialed, "even though the employees had already been recently credentialed by United under the terms of the Provider Manual."  First Amended Complaint ¶ 74, at 19.

At the time La Frontera assumed responsibility to deliver services for each terminated United Health subcontractor, United Health directed La Frontera to execute several "Participation Provider Agreements."  See First Amended Complaint ¶¶ 62-63, at 16.  See United Behavioral Health Facility Participating Provider Agreement §§ 2.1-9.17, at 1-15 (dated July 8, 2013), filed March 21, 2016 (Doc. 3-1)("Participating Provider Agreement").  United Health presented La Frontera with the Participating Provider Agreements on a take-it-or-leave it basis, "for the purpose of paying La Frontera for its services negotiated by HSD."  Response at 3-4 (citing Ranieri Aff. ¶ 14, at 3-4).  La Frontera had to execute a Participating Provider Agreement as "a condition of payment per the HSD/La Frontera non-procurement contract."  Response at 4.  Further, when United Health first presented La Frontera with a Participating Provider Agreement, La Frontera "was only days away from taking over facilities in New Mexico and needed the $1 million authorized by HSD for transition."  Response at 4.  United Health and La Frontera executed the first Participating Provider Agreement on July 8, 2013.  Response at 4 (citing Ranieri Aff. ¶ 15, at 4).  La Frontera executed subsequent Participation

Provider Agreements during the period beginning in July, 2013, and spanning through October 30, 2013.  See First Amended Complaint ¶ 62, at 16.   Under these agreements, La Frontera promised to assume responsibility for delivering services at various New Mexico facilities that HSD assigned through United Health to La Frontera and to meet the service delivery needs of United Health's Enrollees.  See First Amended Complaint ¶ 64, at 17.  United Health, in turn, promised to pay La Frontera for services delivered.  See First Amended Complaint ¶ 64, at 17.

The Participating Provider Agreement that United Behavioral Health and La Frontera executed and made effective on July 8, 2013, contains an arbitration clause.  See Motion at 2; Participating Provider Agreement § 7.1, at 11-12.  The arbitration clause provides:

> It is agreed that prior to any other remedy available to the parties, UBH, Payor, and/or Provider [La Frontera] shall provide written notice of any disputes or claims arising out of their business relationship (the "Dispute") to the other party within thirty (30) days of the final decision date, action, omission or cause from which the Dispute arose, whichever is later (the "Dispute Date"). . . . If the parties are unable to resolve the Dispute within thirty (30) days following receipt of the notice of Dispute . . . then said party shall issue a notice of arbitration to the other parties. . . .   Any arbitration proceeding under this Agreement shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association ("AAA"). . . .   The parties acknowledge that because this Agreement affects interstate commerce the Federal Arbitration Act applies.

Motion at 2-3 (first, third, and fourth alterations in original, second alteration added)(quoting Participating Provider Agreement § 7.1, at 11-12).

### 3. La Frontera Incurs Losses as a United Subcontractor from June 27, 2013, through December 31, 2013.

La Frontera encountered several difficulties in working as a United Health subcontractor from June 27, 2013, through December 31, 2013.  First, when La Frontera's transition team initiated operations in Las Cruces, New Mexico, it discovered that United Health's representations regarding its processing system, information available onsite, and credentialing were false.  See First Amended Complaint ¶ 73, at 19; Motion at 2 ("With regard to the

- 9 -

formation of the Agreement, [La Frontera] alleges that [United Health] made numerous fraudulent and negligent misrepresentations to [La Frontera] for the purpose of inducing [La Frontera] to enter into the Agreement.")(alterations added).  These misrepresentations caused La Frontera increased expenses, and "added at least three months of additional structure and implementation work by La Frontera to effectuate the transition."  First Amended Complaint ¶ 75, at 20.  Second, United Health did not disclose that La Frontera "would have to utilize the same facilities as the terminated providers by first renegotiating facility leases at unfavorable terms . . . ."  First Amended Complaint ¶ 78, at 20.  Third, "United's claims processing system would not accept La Frontera's claims,"  First Amended Complaint ¶ 75, at 20, and United Health had failed to disclose its "claim payment system was not capable of paying La Frontera's claims without significant technical modifications that United subsequently claimed were not possible," First Amended Complaint ¶ 78, at 20.  To overcome some of these difficulties, from July through December 2013, "the Collaborative and La Frontera worked together to try to ensure that the transition process did not disrupt or delay services to United's Enrollees."  First Amended Complaint ¶ 79, at 20.

"La Frontera lost money every month it operated in New Mexico."  First Amended Complaint ¶ 80, at 21.  La Frontera submitted unpaid claims for services rendered to United Health and to "one of United's other companies, Netwerkes Clearing House, Inc."   First Amended Complaint ¶ 81, at 21.  United promised to supply expertise to cure its claims processing issues, "but made no reasonable effort to enable its system to pay La Frontera for the services rendered to United's Enrollees during the Emergency" -- i.e., during the time that La Frontera provided services from June 27, 2013, through December 31, 2013, pursuant to the HSD emergency, no-bid procurement agreement.   First Amended Complaint ¶ 84, at 22.

La Frontera submitted all of its unpaid claims to United Health, and United Health received all of La Frontera's unpaid claims "no later than January 2014." First Amended Complaint ¶ 84, at 22. In March, 2014, United Health asked La Frontera to resubmit all of its unpaid claims; La Frontera resubmitted all 30,000 of its unpaid claims. See First Amended Complaint ¶ 86, at 22. United Health's claims payment system rejected all of La Frontera's claims. See First Amended Complaint ¶ 86, at 22. United Health again asked La Frontera to resubmit its unpaid claims over a ten-day time period, but without submitting more than 5,000 unpaid claims per day. See First Amended Complaint ¶ 87, at 22. La Frontera edited 30,000 claims to conform to United Health's edits, but United Health rejected all of La Frontera's unpaid claims as untimely submitted. See First Amended Complaint ¶ 87, at 22. La Frontera was not paid $3.9 million plus interest that United Health owes La Frontera for services delivered to United Health's Enrollees during the time that La Frontera provided services from June 27, 2013, through December 31, 2013, pursuant to the HSD emergency, no-bid procurement agreement. See First Amended Complaint ¶ 87, at 22. From June through December 2013, United Health either underpaid or failed to pay its Arizona-based providers for services rendered to United Health's Enrollees. See First Amended Complaint ¶ 47, at 13.

"In December 2013, La Frontera was desperately low on funds." Response at 4. La Frontera sought payment from United Health, and, "[a]s a condition of payment (obligation already owed by United to La Frontera)[,] La Frontera was forced to sign a Settlement Agreement and Release with [United Health]." Response at 4. See Settlement Agreement and Release By and Between United Behavioral Health and La Frontera, Inc. at 22-25 (dated December 19, 2013), filed May 9, 2016 (Doc. 13)("Settlement Agreement"). The Settlement Agreement contains a broad release that ostensibly applies to claims for payment that La

Frontera incurred between July 8, 2013, and December 31, 2013.  Settlement Agreement ¶¶ 1-3, at 22-23.  Anticipating arbitration of La Frontera's claims, United Health plans to rely on the Settlement Agreement to argue that its release "bars most, if not all, of the payment claims that [La Frontera] is now pursuing."  Reply at 2 n.1.  The Settlement Agreement itself contains a separate arbitration provision.  See Response at 3; Settlement Agreement at ¶ 8, 24.  The Settlement Agreement's arbitration provision provides:

> Any controversy or claim arising out of or relating to this Settlement Agreement or the Subject Matter shall be resolved by confidential arbitration administered by the American Arbitration Association under its Commercial Arbitration rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Settlement Agreement ¶ 8, at 24.

Despite the Settlement Agreement, La Frontera continued to seek payment from United Health.  See Response at 4-5.  "United put La Frontera off throughout 2014."  Response at 4.  La Frontera's 2015 attempts to seek reimbursement of its unpaid claims also proved fruitless.  See Response at 5.

## PROCEDURAL BACKGROUND

On March 14, 2016, La Frontera filed a First Amended Complaint in state court, alleging nine separate state law tort, contract, statutory, and restitutionary claims against United.  See First Amended Complaint ¶¶ 89-165, at 22-36.  These claims arise from the circumstances surrounding the formation and performance of several provider agreements that United Health and La Frontera executed.  See First Amended Complaint ¶¶ 89-165, at 22-36.  Also, on March 14, 2016, United Health filed a Notice of Removal, removing La Frontera's action to federal court, based on diversity jurisdiction.  See Notice of Removal ¶¶ 5-6, at 1-2.  One week later, on March 21, 2016, United Health filed the Motion.

1.    **United Health's Motion.**

United Health moves the Court, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), the New Mexico Uniform Arbitration Act, N.M. Stat. Ann., §§ 44-7a-1 to 44-7a-32 ("NMUAA"), and the Participating Provider Agreement into which La Frontera entered with United, to compel arbitration and to stay this action pending resolution of the arbitration.  See Motion at 1.  United Health points to the Participating Provider Agreement, indicating that the agreement requires that disputes "arising out of [United Health and La Frontera's] business relationships" be submitted to arbitration.   Motion at 1, 3 (citing Participating Provider Agreement § 7.1, at 11).   United Health contends that, because "all of [La Frontera's] claims relate to either the formation or performance of the [Participating Provider Agreement], La Frontera's claims necessarily 'aris[e] out of their business relationship.'"  Motion at 3 (first and second alterations added, third alteration in original)(quoting Participating Provider Agreement § 7.1, at 11).  Consequently, United Health asserts that La Frontera's claims "must be submitted to binding arbitration."  Motion at 3.

United Health asserts that, "[u]nder controlling federal and New Mexico law, arbitration is mandatory upon demand in cases, like this one, where the claims fall within the scope of the arbitration agreement."  Motion at 3 (citing 9 U.S.C. § 2; N.M. Stat. Ann. § 44-7A-7).   United Health relies on the proposition from Parris v. Valero Retail Holdings, Inc., 727 F. Supp. 2d 1266 (D.N.M. 2010)(Browning, J.), that "'Congress, the New Mexico Legislature, and federal and New Mexico courts have expressed a strong public policy favoring arbitration.'"  Motion at 3 (quoting Parris v. Valero Retail Holdings, Inc., 727 F. Supp. 2d at 1281).   United Health further contends that "[c]ourts take a liberal policy toward arbitration and resolve 'any doubts concerning the scope of arbitrable issues . . . in favor of arbitration.'"   Motion at 4 (first

alteration added, second alteration in Motion)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).  "Once a party files a motion to compel arbitration," United Health alleges, "the court's role is limited to determining whether an agreement to arbitrate exists and whether the dispute falls within its scope."  Motion at 4 (citing N.M. Stat. Ann. § 44-7A-7).  United Health argues that, upon concluding that an arbitration agreement exists and encompasses the dispute, courts have no discretion, but only the power to order arbitration to occur.  See Motion at 4 (citing Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217 (1985)(alteration in Motion)("[T]he [Federal Arbitration] Act leaves no place for the exercise of discretion by a District Court, but instead mandates that District Courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.")).

United Health additionally argues that arbitration provisions which require arbitration of disputes arising from the parties' business relationships are construed broadly.  See Motion at 4 (internal citations omitted).  In support of this thesis, United Health asserts that arbitration provisions "have been held to govern claims arising from the contract, those that did not arise from the contract, such as statutory claims, and claims that arose prior to the execution of the contract."  Motion at 4 (citing Aztec Med. Servs. v. Burger, 792 So. 2d 617, 622-24 (Fla. App. 2011); Kan. City Urology, P.A. v. United Healthcare Servs., 261 S.W.3d 7, 11 (Mo. App. 2008); Lakeland Anesthesia, Inc. v. United Healthcare of La., Inc., 871 So. 2d 380, 392 (La. App. 2004)).  United Health presses that fraudulent inducement claims are also subject to arbitration, except when a fraudulent inducement claim specifically alleges that an arbitration clause was induced by fraud.  See Motion at 4-5 (citing Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443-49 (2006); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 406 (1967);

- 14 -

NCR Corp. v. Hoppe Specialty Co., No. CIV 93-0791 LH/DJS, 1994 WL 510999, at *2 (D.N.M. Jan 28, 1994)(Hansen, J.)).   United Health concludes, therefore, that because La Frontera's "claims arise in their entirety from the circumstances surrounding the formation and performance of the Agreement it entered into with [United Health, La Frontera's] claims necessarily arise from its business relationship with [United Health] and are subject to binding arbitration." Motion at 5 (alterations added).  United Health asserts that the Court should order arbitration and stay the proceedings until the arbitration's resolution.  See Motion at 5.

        **2.**        **La Frontera's Response.**

        La Frontera responds in opposition to United Health's Motion, asserting that "[t]here is no valid, enforceable agreement to arbitrate."  Response at 1.  La Frontera states that "whether a valid agreement to arbitration exists" is a threshold question, Response at 5 (citing 9 U.S.C. § 2), and further contends that, "[w]hile there is a presumption in favor of arbitration, that presumption disappears when the parties dispute the existence of a valid arbitration agreement," Response at 5 (alteration added)(citing Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002)(McKay, J.); Heye v. Am. Golf Corp., 2003-NMCA-138, 80 P.3d 495, 498).   La Frontera contends that "[a]greements to arbitrate may accordingly be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability."  Response at 5 (citing Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 67 (2010)).   After setting forth general propositions regarding the unenforceability of arbitration agreements, La Frontera forwards three arguments to support its view that the Court should not compel arbitration.  See Response 6-12.

        First, La Frontera argues that the Participating Provider Agreement's arbitration clause does not bind the parties.  See Response at 6-8.  La Frontera asserts that the Participating Provider Agreement is not controlling, because it "was executed solely for the money to flow

from HSD through United to La Frontera."   Response at 7.   La Frontera contends that the controlling agreement between the parties was negotiated "in the midst of the New Mexico behavioral health emergency," Response at 7, and La Frontera states that the controlling agreement's terms were simple:

> La Frontera agreed (i) to timely and appropriately assume responsibility for delivering services at various New Mexico facilities assigned by HSD through United to La Frontera; and (ii) to meet the service delivery needs of United's Enrollees.  For its part, United promised HSD that United would pay La Frontera for delivering these services during the Emergency.

Response at 7.  According to La Frontera, its agreement with HSD is controlling.  See Response at 7.

Second, La Frontera contends that the Participating Provider Agreement is unconscionable and, hence, unenforceable.  See Response at 7-10.  La Frontera concedes that New Mexico law does not require a showing of both procedural and substantive unconscionability to invalidate a contract.  See Response at 8 (citing Cordova v. World Finance Corp., 2009-NMSC-021, ¶ 24, 208 P.3d 901, 907).  Nevertheless, La Frontera makes arguments sounding in both procedural and substantive unconscionability.  See Response at 8-10.

Regarding substantive unconscionability, La Frontera asserts that "an unconscionable agreement is one 'that is unreasonably favorable to one party while precluding a meaningful choice of the other party.'"  Response at 8 (quoting Cordova v. World Finance Corp., 2009-NMSC-021, ¶ 24, 208 P.3d at 907).  La Frontera argues that the Participating Provider Agreement is unfair, because, as it is a services contract, "the most likely claim either party would ever file under the agreement would be a claim for damages by La Frontera for [United Health's] failure to pay."  Response at 9.  La Frontera then explains that, if La Frontera failed to perform under the contract, United Health would not likely sue or seek arbitration, "because

[United Health] can simply terminate the agreement and decline to allow La Frontera to continue providing services to Medicaid beneficiaries."  Response at 10.  La Frontera emphasizes that, "[a]lthough the provision appears to require both parties to arbitrate any disputes, the only colorable dispute likely to be subject to the provision is a claim by La Frontera that United failed to pay."  Response at 10.  La Frontera states that, where arbitration agreements appear fair, but really "adversely affect only one party to the agreement," they are unconscionable.  Response at 10 (citing Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, 2013-NMCA-077, ¶¶ 22-25, 306 P.3d 480, 489-90).

La Frontera also stresses that the Participating Provider Agreement contains a provision which marks a significant departure from New Mexico's six-year statute of limitations for actions arising from written contracts.  See Response at 9 (citing N.M. Stat. Ann. § 37-1-3(A)).  Participating Provider Agreement § 7.1 states that "the parties knowingly and voluntarily waive any right to a Dispute if arbitration is not initiated within one year after the Dispute Date," where "Dispute Date" is defined as "the final decision date, action, omission, or cause from which the Dispute arose, whichever is later."  Participating Provider Agreement § 7.1, at 11.  La Frontera argues that this arbitration agreement's provision severely limits La Frontera's rights.  See Response at 9.

La Frontera next states that, "[w]hen looking at procedural unconscionability, the Court 'examines the particular factual circumstances surrounding the formation of the contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other.'"  Response at 8 (quoting Cordova v. World Finance Corp., 2009-NMSC-021, ¶ 23, 208 P.3d at 907-08).  La Frontera explains that, before it began providing service in New Mexico, HSD advised La Frontera that,

- 17 -

to obtain the one million dollar transition payment that HSD authorized, La Frontera had to execute the Participating Provider Agreement with United Health.  See Response at 7.  La Frontera presses that "[t]here was no negotiation of any terms and conditions that [United Health] included in the [Participating Provider Agreement]."  Response at 7 (alterations added).  La Frontera accordingly argues:

> It is fundamentally unfair to bind La Frontera to the arbitration term in the [Participating Provider Agreement], which was executed solely as a condition of payment for services promised by La Frontera to HSD. . . . La Frontera had no choice but to execute the [Participating Provider Agreement] if La Frontera was to be paid.

Response at 8.  As a result, La Frontera contends that the arbitration agreement is procedurally unconscionable and therefore unenforceable.  See Response at 8.

Third, La Frontera asserts that the Court should not compel arbitration of all of La Frontera's claims, because not all of the claims that La Frontera asserts in its First Amended Complaint arise from the Participating Provider Agreement.  See Response at 10-12.  La Frontera maintains its argument that its claims arise, not under the Participating Provider Agreement, but rather under a contract it entered with HSD before executing the Participating Provider Agreement.  La Frontera explains that

> the essence of [its] claims is that there were multiple agreements among the parties, but the only properly negotiated terms and conditions were for La Frontera to take over provision of behavioral health services from one or more of [United Health's] New Mexico providers and for [United Health] to pay La Frontera for the services at 100% of New Mexico's Medicaid rates.

Response at 10.  La Frontera further argues that one of its claims "is based on its status as a third party beneficiary of [United Health's] Statewide Contract with the Collaborative."  Response at 10 (citing First Amended Complaint ¶¶ 130-142, at 31-33).  La Frontera relatedly argues that the Court should not compel arbitration of its promissory estoppel and quantum meruit/unjust

enrichment claims, because those claims "are not based on any written agreements with [United Health]."  Response at 11.  See First Amended Complaint ¶¶ 155-65, at 35-36.  La Frontera further contends that "[t]he facts underpinning La Frontera's claims do not require performance or interpretation of the [Participating Provider Agreement]," nor arise out of that agreement. Thus, La Frontera concludes that the Court should not compel arbitration of all or certain of its claims.  Response at 12.  See id. at 11 (citing CardioNet, Inc. v. Cigna Health Corp., 751 F.3d 165, 172 (3rd Cir. 2014)).

Last, La Frontera states that a stay is unnecessary.  See Response at 12.  La Frontera argues that United Health "made no showing of a need for a stay."  Response at 12.  Further, La Frontera explains that, "[e]ven where there is a combination of arbitrable and nonarbitrable claims, litigation can proceed in piecemeal fashion and the entire action does not need to stay pending arbitration."  Response at 12 (citing Coors Brewing Co. v. Molson Breweries, 51 F.3d 1511, 1517 (10th Cir. 1995)).  Accordingly, La Frontera requests that the Court deny United Health's Motion in its entirety.  See Response at 12.

### 3. **United Health's Reply**.

United replies in support of its Motion, arguing that La Frontera's attempts to circumvent the Participating Provider Agreement's arbitration clause fail.  See Reply at 1-12.  United Health begins by reiterating its view that the arbitration agreement, which became effective on July 8, 2013, is legally binding.  See Reply at 2-3.  United Health also reiterates its view that the Participating Provider Agreement's arbitration clause "applies to all disputes and claims between the parties, regardless whether the claims are based on the terms of the Agreement."  Reply at 3 (emphasis in original).  United Health restates both the FAA's and New Mexico's "strong policy favoring arbitration."  Reply at 3.  United Health then turns to its overarching reply that La

Frontera's "sole argument to invalidate the arbitration provision (as being unconscionable) fails, and all of [La Frontera's] claims fall within the broad scope of the arbitration provision."  Reply at 4.

United Health replies to La Frontera's unconscionability arguments.  See Reply at 4-9. United Health notes that La Frontera has the burden to prove that the arbitration agreement is unconscionable.  See Reply at 4 (citing Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 39, 304 P.3d 409, 419).  United Health asserts that La Frontera cannot sustain its burden, first, because La Frontera "provides no evidence that would render the Agreement procedurally unconscionable" and, second, regarding substantive unconscionability, because "the arbitration provision in the Agreement applies to [United Health and La Frontera] in precisely the same manner."  Reply at 4 (alterations added).

With respect to La Frontera's procedural unconscionability argument, United Health argues that La Frontera offers no evidence of procedural unconscionability.  See Reply at 5-7. United Health contends that "[c]ourts applying New Mexico law have routinely rejected [that defense] . . . where the party seeking to avoid an arbitration provision . . . argues merely that it had no choice but to sign the contract."  Reply at 5 (citing Guthmann v. LaVida Llena, 1985-NMSC-106, ¶ 18, 709 P.2d 675, 679; Barron v. Evangelical Lutheran Good Samaritan Soc'y, 2011-NMCA-094, ¶ 45, 265 P.3d 720, 732-33; THI of N.M. at Vida Encantada, LLC v. Archuleta, 2013 WL 2387752, at *17 (D.N.M. April 30, 2015)(Hansen, J.)).  United Health contends that La Frontera provides no evidence that it, or its President and CEO, Ranieri, was rushed into signing the contract without an opportunity to read it, that La Frontera or Ranieri signed the agreement under duress, that Ranieri was misled regarding the agreement's terms, or that United Health employed any high pressure tactics against La Frontera or Ranieri.  See Reply

at 5.   Moreover, according to United Health, La Frontera is a "large, sophisticated corporation that provides an array of behavioral health services through several facilities," and, hence, is not the contracting party that ordinarily is a victim for whom unconscionability offers a sound defense.   Reply at 6 (citing Guthmann, 1985-NMSC-106, ¶ 21, 709 P.2d at 680).

In reply to La Frontera's substantive unconscionability defense, United first states that the defense "analyzes whether the particular terms of the contract are unfairly and unreasonably one-sided in favor of the drafter."   Reply at 7 (citing Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, 2013-NMCA-077, ¶ 13, 306 P.3d 480, 486; Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 188 P.3d 1215, 1221).   United asserts that La Frontera relies exclusively on cases in which the challenged arbitration provision was one-sided -- i.e., where the arbitration agreement requires the non-drafting party to arbitrate its likely claims, but reserved to the drafting party the option to pursue its likely claims through litigation.   Reply at 7-9 (citing Response at 8-10 (citing Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, 2013-NMCA-077, 306 P.3d 480; Cordova v. World Finance Corp., 2009-NMSC-021, 208 P.3d 901)). United Health indicates that the Participating Provider Agreement's arbitration clause, by contrast, is not one-sided, because it requires both parties to submit all claims arising from their business dealings to arbitration without exception.   See Reply at 8 (citing Participating Provider Agreement § 7.1, at 11-12).

United Health also replies to La Frontera's argument that the arbitration provision is effectively one-sided, because, according to La Frontera, United Health is unlikely to pursue a claim against La Frontera.   See Reply at 8.   United Health attacks La Frontera's premise, arguing that, in fact, United Health

> could initiate a variety of claims against [La Frontera] through arbitration,
> including . . . (i) the recovery of overpayments made to [La Frontera] by mistake

> or due to inaccurate or fraudulent billing submissions . . . and (ii) declaratory
> relief to establish [United Health's] right to terminate the Agreement as a result of
> a breach by [La Frontera].

Reply at 8 (alterations added).  United Health contends that, because the Participating Provider

Agreement's arbitration clause requires it to submit these claims to arbitration, the clause is not

unfairly one-sided and, hence, not substantively unconscionable.  See Reply at 8.  United Health

additionally argues that substantive unconscionability occurs where an arbitration agreement

"except[s] the drafting party from the requirement to arbitrate certain types of claims."  Reply at

8 (emphasis in original)(citing Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC,

2013-NMCA-077, ¶¶ 28-30, 306 P.3d at 491; Cordova v. World Finance Corp., 2009-NMSC-

021, ¶¶ 24-25, 208 P.3d at 908).   United Health asserts that the Participating Provider

Agreement's arbitration clause contains no such exception, and, on that ground, advances the

stronger thesis that "the issue of which party is more likely to initiate a claim . . . is wholly

relevant."  Reply at 9.  Consequently, United Health concludes that the Participating Provider

Agreement's arbitration clause is not substantively unconscionable.  See Reply at 9.

United  Health  additionally  replies  to  La Frontera's  argument  that  the  Participating

Provider  Agreement's arbitration clause does not apply to all of La Frontera's claims.  See Reply

at 9-11.  United Health clarifies that La Frontera "bears the burden of proving that its claims do

not fall within the scope of the arbitration provision . . . ."  Reply at 9 (citing AT&T Techs, Inc.

v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986)).  United Health also reasserts it view

that the Court should construe the arbitration agreement liberally, resolving doubts regarding the

arbitration agreement's scope in the favor of arbitration.  Reply at 9 (citing AT&T Techs, Inc. v.

Commc'ns Workers of Am., 475 U.S. at 650).  United Health then adverts to the Participating

Provider  Agreement's arbitration clause, stating that the clause "applies to all disputes or claims

by either party 'arising out of their business relationship.'"   Reply at 9 (emphasis in original)(quoting Participating Provider Agreement § 7.1, at 11).

In reply to La Frontera's assertion that certain of La Frontera's claims are not based on the Participating Provider Agreement's terms, United contends that "the law is clear that [La Frontera's] claims need not be based on the terms of the Agreement in order to fall within the broad scope of the arbitration provision."   Reply at 9 (citing Zink v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 13 F.3d 330, 332 (10th Cir. 1993)(Tacha, J.); Merrick v. UnitedHealth Grp., Inc., 127 F. Supp. 3d 138, 150 (S.D.N.Y. 2015)(Ramos, J.); Aztec Med. Servs. v. Burger, 792 So. 2d at 623; Kan. City Urology, P.A. v. United Healthcare Servs., 261 S.W.3d at 11; Lakeland Anesthesia, Inc. v. United Healthcare of La., 871 So. 2d at 391-92 & 396 n.3 (La. Ct. App. 2004)).   United Health contends that "all of the claims that it seeks to litigate in this action are based on [United Health's] alleged failure to pay claims that [La Frontera] submitted to [United Health] for medical services [La Frontera] provided."   Reply at 11 (alterations added)(citing Response at 11).   United Health argues that such claims "unquestionably involve 'the business relationship' between [United Health and La Frontera]" and, as a result, are not shielded from arbitration, even though some of La Frontera's claims either do not sound directly in the Participating Provider Agreement's terms or arise from conduct that predates that agreement.   Reply at 11 (alterations added)(quoting Participating Provider Agreement at § 7.1, 11).

Last, United Health clarifies that it requests a stay pursuant to FAA § 3, which, in its entirety, provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an

> agreement, shall on application of one of the parties stay the trial of the action
> until such arbitration has been had in accordance with the terms of the agreement,
> providing the applicant for the stay is not in default in proceeding with such
> arbitration.

9 U.S.C. § 3.  United Health argues that it is not "seeking to prevent any non-arbitrable claims

from going forward," because, in United Health's view, "all of [La Frontera's] claims are subject

to arbitration."  Reply at 12 (alteration added).  Consequently, United Health argues that the

Court should enter an order compelling La Frontera to submit its claims to binding arbitration

and stay the proceedings pending resolution of the arbitration.  See Reply at 12.

### 4.   The Hearing.

On July 26, 2016, the Court held a hearing on United Health's Motion.  See Draft

Transcript of Hearing at 1:1-2, taken July 26, 2016 (Court)("Tr.").[2]  Upon the Court's invitation,

United Health presented its theory of the case, tacking closely to the arguments that it made in its

Motion and Reply.  See Tr. at 2:6-7:4 (Park).  United Health argued that, under the FAA, the

Court must resolve two inquiries only: (i) whether there is a valid agreement to arbitrate; (ii)

whether, if there is a valid agreement to arbitrate, the agreement's scope covers the claims

involved in the lawsuit.  See Tr. at 2:11-18 (Park).  Addressing those questions in reverse order,

United Health argued that the Court should conclude each question in the affirmative.  See Tr. at

2:19-7:4 (Park).  United Health asserted that all of La Frontera's claims arise out "of the business

relationship" with United Health and, therefore, the July, 2013, arbitration agreement covers all

of La Frontera's claims against United Health.  See Tr. at 3:6-8 (Park).  United Health then

argued that the arbitration agreement is neither substantively nor procedurally unconscionable,

see Tr. at 3:22-6:18 (Park), summarizing that "this is a bilateral arbitration agreement that both

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

parties executed freely and fairly," Tr. at 6:19-21 (Park).  United Health also stressed that La Frontera could not have overlooked the Participating Provider Agreement's arbitration clause, because the Participating Provider Agreement includes, directly above the signature line, a bolded, all-caps warning that the agreement contains an arbitration clause.  See Tr. at 5:20-25 (Park).

The Court then asked Mr. Park, who had entered an appearance for "United," whom he represents.  See Tr. at 1:22-23 (Park); Tr. at 2:7-8 (Court).  Mr. Park stated that he represents all defendants in the case.  See Tr. at 2:9-10 (Park).  Mr. Park explained that La Frontera has a business relationship with all the United Health Defendants and that the arbitration agreement governs all La Frontera's claims against United Health arising from their business relationship. See Tr. at 7:19-8:2 (Park).

The Court then inquired into the corporate relationship between Defendants United Behavioral Health and United Healthcare Insurance Company.  See Tr. at 8:3-8 (Court).  Mr. Park explained that the corporate relationship between those companies was a parent-subsidiary relationship, but acknowledged that "it could be a sister corp relationship."  Tr. at 8:9-15 (Park). The Court again inquired whether Mr. Park represents all Defendants, and Mr. Park confirmed that he did.  See Tr. at 9:1-3 (Court, Park).  After recognizing that, in New Mexico, Optumhealth does business as United Behavioral Health, the Court then asked whether the arbitration agreement at issue was between (i) United Behavioral Health and La Frontera; (ii) United Healthcare Insurance Company and La Frontera; or (iii) both United Behavioral Health and United Healthcare Insurance Company and La Frontera.  See Tr. at 9:13-20 (Court).  The Court also inquired whether there is at issue one or two agreements between United Health and La Frontera.  See Tr. at 9:13-20 (Court).  Mr. Park clarified his understanding that there was one

- 25 -

arbitration agreement between La Frontera, and all of the United Health parent, subsidiary, and sister corporations.  See Tr. at 9:21-10:3 (Park).

Upon the Court's invitation, La Frontera indicated its view that "the United Behavioral Health, Inc., is a corporation, United Healthcare Insurance Company, Inc., is a corporation.  And they do business in New Mexico as Optumhealth."  Tr. at 10:20-23 (Kolsrud).  The Court then looked to the July 8, 2013, Participating Provider Agreement, which indicates the contracting parties as United Behavioral Health and La Frontera.  See Tr. at 11:24-12:4 (Court).  See also Participating Provider Agreement at 16.  The Court asked La Frontera whether there is "a contract between La Frontera and United Healthcare Insurance Company, Inc."  Tr. at 11:24-12:4 (Court).  La Frontera indicated that there was not a contract between these two entities.  See Tr. at 12:5 (Kolsrud).  The Court then asked La Frontera whether it is "disputing that [the July 8, 2013, arbitration agreement] covers or doesn't cover United Healthcare Insurance Company, Inc."  Tr. at 12:6-8 (Court).  La Frontera was "not sure if [the Participation Provider Agreement's arbitration clause] does or not [cover United Healthcare Insurance Company] . . . [because La Frontera was] not sure . . . which entity was conducting which portion of the management business at that time."  Tr. at 12:9-13 (Kolsrud).

Mr. Park again attempted to shed light on the corporate relationship between the United Health entities, explaining that "Optumhealth New Mexico is a joint venture between United Behavioral and United Healthcare."  Tr. at 22:23-24 (Park).  Mr. Park stated that United Behavioral Health and United Healthcare Insurance Company came together to create Optumhealth New Mexico, and, in New Mexico, United Behavioral Health does business as Optumhealth New Mexico.  See Tr. at 23:1-5.  The Court then reiterated its concern that, looking at the Participating Provider Agreement's face, it is "not seeing an arbitration agreement with

United Healthcare." Tr. at 23:19-21 (Court).  The Court explained its concern "that La Frontera has sued United Healthcare Insurance, and there is no arbitration agreement that covers them, and so if there is no arbitration agreement I guess I'm concerned about my ability to compel that portion of the dispute to arbitration." Tr. at 24:12-16 (Court).  Mr. Park attempted to assuage the Court's concern, contending that La Frontera has

> sued United Healthcare Insurance Company for obligations arising . . . out of this business relationship, Your Honor.  And the only part of this business relationship that has anything to do with United Healthcare Insurance Company is its affiliation with United Behavioral Health, which has the d/b/a of Optumhealth New Mexico.  And so . . . if United Healthcare Insurance doesn't have access to the arbitration provision, they can't also have reciprocal obligations underneath the agreement . . . .

Tr. at 24:20-25:9 (Park).  The Court then expressed its reservations that Mr. Park's argument raised a merits issue that the Court should not determine at the present juncture.  See Tr. at 25:10-14 (Court).  Mr. Park offered United Health's view that an arbitrator could determine that "this third defendant [i.e., United Healthcare Insurance Company] shouldn't even be a part of this suit." Tr. at 25:19-20 (Park).

To this point, the Court asked La Frontera:

> If I find that there is a valid motion to compel as to La Frontera and the dispute with United Behavioral Healthcare and the Optumhealth group but I decide I can't make this arbitration agreement cover United Healthcare, do you want a split suit? Do you want me to compel arbitration on the dispute involving United Behavioral Healthcare but leave your dispute as to United Healthcare Insurance?

Tr. at 28:4-11 (Court).

Regarding the possibility of a split suit, La Frontera stated that, "[i]f it has to be, yes." Tr. at 28:16 (Kolsrud).  The Court then indicated its view that a split suit would entail a stay pending arbitration and again asked La Frontera whether, "under those circumstances[,] you'd want to leave" the claims that La Frontera asserted against United Healthcare Insurance

Company in federal court.  Tr. at 28:23-25 (Court).  La Frontera responded that "there is no basis for arbitration" of its third-party beneficiary claim "based on the statewide entity contract," which did not include an arbitration clause.  Tr. at 29:5-8 (Kolsrud).  The Court then inquired into how La Frontera's third-party beneficiary claim would escape the Participating Provider Agreement's arbitration clause.  See Tr. at 29:25-39:3 (Court).  La Frontera replied that its third-party beneficiary claim does not arise under the Participating Provider Agreement.  See Tr. at 30:9-11 (Kolsrud).  "So," La Frontera reasoned, "the arbitration agreement is irrelevant to the third party beneficiary claim."  Tr. at 30:11-12 (Kolsrud).

> Then, upon the Court's invitation, United Health argued
>
> that . . . the arbitration agreement covers any claim arising out of the business relationship between the parties, any claim that arises out of the business relationship whether it's within the July 2013 agreement or within this third party agreement that my clients aren't a party to, that they say that they have with the state and that they're a third party intended beneficiary . . . .

Tr. at 25:16-23 (Park).  United Health again asserted that the Participating Provider Agreement's arbitration clause covers all of La Frontera's claims, because they arise out of a business relationship with United Health.  See Tr. at 31:1-10 (Park).  United Health also opposed the Court's splitting La Frontera's suit by compelling arbitration of only some of La Frontera's claims and staying proceedings with respect to the other claims pending the resolution of arbitration.  See Tr. at 31:11-32:12 (Park).  Advancing its argument against a split suit, United Health contended that

> [t]he only relationship that [La Frontera has] with United Healthcare Insurance Company is . . . [based on their] relationship with Optumhealth New Mexico, . . . which is a subsidiary or a joint venture of United Healthcare Insurance Company, so they don't have direct claims against United Healthcare Insurance Company, there wouldn't be anything to keep here . . . .  [T]heir only claims against United Healthcare Insurance Company are derivative of their claims against Optumhealth New Mexico . . . .  So they don't have any direct contract with United Healthcare Insurance Company.  They just have claims that

are passed through Optumhealth New Mexico.  And they're suing United Healthcare Insurance Company because it's a joint venture with . . . United Behavioral.  So there wouldn't be anything to leave here . . . .

Tr. at 31:15-32:9 (Park).

The Court also invited La Frontera to address its unconscionability defenses, inquiring whether La Frontera understood its biggest issue to be unconscionability.  See Tr. at 12:14-17 (Court).  La Frontera replied: "No. . . . [Its] threshold issue is [that] there is no agreement to arbitrate."  Tr. at 12:18-19 (Kolsrud).    La Frontera expressed that its primary agreement was with HSD, not with United Health, and that La Frontera formed an agreement with United Health only for the purposes of payment for the obligations that La Frontera owed to HSD.  See Tr. at 13:14-14:14 (Kolsrud).  La Frontera explained:

> [T]he CEO, Dan Ranieri, of La Frontera cut a deal with Ms. McWilliams of HSD. And the agreement was basically on four points.  One, La Frontera would come into New Mexico, take over designated facilities and supply these services and comply with Medicaid laws.  The second point was La Frontera would be paid Medicaid rates to do it.  The third point was in order to maintain a funding stream, La Frontera would initially receive funds from HSD, but would have to then receive funds that would be fund[ed] through [United Health].  And the fourth point is that it was a six month deal.  The deal was negotiated between McWilliams and Dan Ranieri.  The performance measures[,] the standards of performance that La Frontera owed under the contract were to HSD, not United [Health]. . . . United [Health] wanted the money fund[ed] through them in order for United [Health] to take its percentage of the funds that it believed it was entitled to. . . . [I]t was only after we had . . . signed up with HSD that we had to then sign the agreement that's the subject[] of this case right now with United in order to get paid.  It was a funding stream.

Tr. at 13:14-14:14 (Kolsrud).  La Frontera stressed that its "deal [was] with the state," Tr. at 16:9 (Kolsrud), that it "owed United no performance standards," Tr. at 17:12-13 (Kolsrud), and that the terms of its agreement with United, apart from the terms relating to funding, were irrelevant, see Tr. at 16:7-14 (Kolsrud).  La Frontera also argued that its relationship with United Health did not include "offer and acceptance" and, resultingly, concluded that "there is not an arbitration

agreement." Tr. at 20:7 (Kolsrud); id. at 20:23-24 (Kolsrud).

La Frontera further expressed its view that the controlling agreements do not contain an arbitration clause.  See Tr. at 16:14-19 (Kolsrud).  La Frontera indicated that its agreement with HSD did not contain an arbitration clause.  See Tr. at 16:14-15 (Kolsrud).  La Frontera also pressed its argument that it is a third-party beneficiary to the Statewide Entity agreement between HSD and United Health -- an agreement which does not contain an arbitration clause. See Tr. at 16:16-19 (Kolsrud).

In addition to its arguments that its contract with HSD controls and its contract with United Health is illusory, La Frontera also presented its arguments that its agreement with United Health is unconscionable.  See Tr. at 17:25-18:2 (Kolsrud).  La Frontera maintained that the agreement was procedurally unconscionable, because La Frontera was invited to New Mexico to manage "a huge emergency crisis in the behavioral health system[,]" Tr. at 17:17-18 (Kolsrud), and, at the last minute of contract negotiation, United Health presented La Frontera with the Participating Provider Agreement, see Tr. at 17:3-8 (Kolsrud).  La Frontera contended that, because the Participating Provider Agreement's purpose was to secure a funding stream from HSD to La Frontera through United Health, "[n]obody talked about any of the provisions in the [Participating Provider Agreement]." Tr. at 17:8-9 (Kolsrud).  Therefore, as La Frontera reasons, the agreement is procedurally unconscionable.  See Tr. at 17:25-18:10 (Kolsrud).  La Frontera also adverted to its substantive unconscionability argument.  See Tr. at 18:11-12 (Kolsrud).  La Frontera stated: "Substantively, the [Participating Provider Agreement] is unfair, because United basically says well we can pick and choose which terms we wanted enforced in that agreement, even though nobody talked about any of them." Tr. at 18:11-14 (Kolsrud).

La Frontera also addressed its December 17, 2013, "settlement agreement" with United.

Tr. at 33:21-22 (Kolsrud).  La Frontera explained the origin of this agreement:

> [T]he funding stream for money for Medicaid rates would go to United and then
> to well, La Frontera.  By December [2013], almost at the end of that six month
> period on the contract, United [Health] finally started paying La Frontera.  But
> [United Health] cut the rates from Medicaid rates down to something else.  And
> La Frontera at that time was desperate for funds, and United came to them and
> said here, here's a settlement agreement and a release.  You sign this and we'll
> pay you.

Tr. at 33:7-16 (Kolsrud).  The Court asked if La Frontera was making any claims on the

December 17, 2013, settlement agreement.  See Tr. at 34:11-12; 34:19-35:7 (Court).  La Frontera

responded that "[i]n the complaint we had an ongoing pattern of what we considered to be

fraudulent misrepresentations" and suggested that the December 17, 2013, settlement agreement

formed a part of that pattern.  Tr. at 36:1-3 (Kolsrud).

The Court acknowledged La Frontera's argument about the settlement agreement's

import, but stated that "it would seem . . . that the arbitration agreement that's governing is the

one that's in what I think everybody calls the agreement [i.e., the Participating Provider

Agreement], rather than the settlement agreement."  Tr. at 36:9-11 (Court).  Both La Frontera

and United Health agreed with the Court's statement.  See Tr. at 36:14-15 (Kolsrud)("[F]or the

purpose of this hearing it certainly is.");  Tr. at 36:26-37:2 (Park)("I think you're right.  I don't

think [La Frontera] ha[s] any claims arising out of that settlement agreement.").

The Court gave United Health the last word.  See Tr. at 36:21 (Court).  United Health

used the opportunity to argue that the Court should not split the suit between claims against

United Behavioral Health and United Health Insurance, because La Frontera does not have any

direct claims against United Healthcare Insurance.  See Tr. at 37:15-20 (Park).  The Court then

reiterated its concern that only United Behavioral Health and La Frontera executed the

Participating Provider Agreement.  See Tr. at 38:4-7 (Court).  See also Participating Provider

Agreement at 16.  United Health then argued in the alternative that, under the FAA, the Court should stay any claims against United Healthcare Insurance that remain in federal court until the arbitration's conclusion.  See Tr. at 38:22-24 (Park).

The Court stated its inclination "to grant the motion at least as to United Behavioral Health . . . and send all that dispute to arbitration."  Tr. at 39:11-17 (Court).    With respect to United Healthcare Insurance and Optumhealth, the Court took United Health's Motion under advisement.  See Tr. at 40:6-15 (Court).  The Court thanked the parties for their presentations. See Tr. at 42:12-14 (Court).

## LAW REGARDING ARBITRATION AGREEMENTS

### 1.    Federal law.

"The FAA reflects the fundamental principle that arbitration is a matter of contract." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 67 (2010).  "[T]he basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate." Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 270 (1995).  "The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms."  Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 67-68 (internal citations omitted).

Under § 4 of the FAA, a party "aggrieved" by the failure of another party "to arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  If a party is aggrieved by the refusal of another to arbitrate under a written agreement, the district court, upon petition, "shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make

an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.  Section 2, the "primary substantive provision of the Act," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4."  Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 64.

Upon a finding that a matter is referable to arbitration, the FAA also indicates that the district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."   9 U.S.C. § 3. Notwithstanding the terms of 9 U.S.C. § 3, however, several Courts of Appeal have concluded that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709-10 (4th Cir. 2001). See Green v. Ameritech Corp., 200 F.3d 967, 973 (6th Cir. 2000)("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration."); Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 156 n.21 (1st Cir. 1998); Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164 (5th Cir. 1992); Sparling v. Hoffman Constr. Co., 864 F.2d 635, 638 (9th Cir. 1988).

The Tenth Circuit has cautioned that, when one of the parties petitions the court to stay an action pending compulsory arbitration, 9 U.S.C. § 3's mandatory language is binding, and it is error for the court to dismiss the action.  See Adair Bus Sales, Inc. v. Blue Bird Corp., 25 F.3d

953, 955 (10th Cir. 1994).  When, however, the party seeking to compel arbitration requests the court for dismissal, and there is no evidence in the record of any party requesting a stay, it is not error for the district court to dismiss the case.  See <u>Armijo v. Prudential Ins. Co. of Am.</u>, 72 F.3d 793, 797 (10th Cir. 1995); <u>Cornoyer v. AT&T Mobility Servs., LLC</u>, No. CIV 15-0474 JB/WPL, 2016 WL 6404853, at *7-8 (D.N.M. Oct. 5, 2016)(Browning, J.).

### 2.    <u>New Mexico Law.</u>

The NMUAA provides that an agreement to submit any controversy arising between the parties to arbitration is "valid, enforceable and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract."  N.M. Stat. Ann. § 44-7A-7(a).  If the court concludes that there is an enforceable agreement to arbitrate, it shall order the parties to arbitrate. See N.M. Stat. Ann. § 44-7A-8(a).  Where the provision for arbitration is disputed, the court's function is to determine whether there is an agreement to arbitrate and to order arbitration where an agreement is found.  See N.M. Stat. Ann. § 44-7A-8(a).

Similar to the federal courts' interpretation of the FAA, New Mexico courts have viewed the NMUAA as an expression of a public policy favoring arbitration.  See <u>United Tech. & Res., Inc. v. Dar Al Islam</u>, 1993-NMSC-005, ¶ 11, 846 P.2d 307, 309 ("The legislature and the courts of New Mexico 'have expressed a strong policy preference for resolution of disputes by arbitration.'")(quoting <u>Dairyland Ins. Co. v. Rose</u>, 1979-NMSC-021, ¶ 14, 591 P.2d 281, 284). More specifically, New Mexico courts have construed the act's legislative purpose as an attempt to reduce the court's caseload.  See <u>Bd. of Educ. Taos Mun. Sch. v. Architects, Taos</u>, 1985-NMSC-102, ¶ 10, 709 P.2d 184, 186 ("A concern for preserving scarce judicial resources lies at the heart of the preference for arbitration."); <u>Dairyland Ins. Co. v. Rose</u>, 1979-NMSC-021, ¶ 19, 591 P.2d at 285 (finding that "the legislative intent in enacting the [NMUAA], and the policy of

the courts in enforcing it, is to reduce caseloads in the courts, not only by allowing arbitration, but also by requiring controversies to be resolved by arbitration where contracts or other documents so provide").  In New Mexico, when the court finds that an arbitration agreement exists and is valid, then, in accordance with the NMUAA, the court has a duty to enforce the provisions of the agreement and order adherence to that arbitration agreement.  See Bernalillo Cty. Med. Ctr. Emps' Ass'n Local 2370 v. Cancelosi, 1978-NMSC-086, ¶¶ 4-5, 587 P.2d 960, 961.  Consistent with this understanding, the Supreme Court of New Mexico has interpreted the NMUAA to limit the court's role to determining if an arbitration agreement exists and, if so, to order the parties to arbitration:

> When a broad and general arbitration clause is used, as in this case, the court should be very reluctant to interpose itself between the parties and the arbitration upon which they have agreed. When the parties agree to arbitrate any potential claims or disputes arising out of their relationships by contract or otherwise, the arbitration agreement will be given broad interpretation unless the parties themselves limit arbitration to specific areas or matters. Barring such limiting language, the courts only decide the threshold question of whether there is an agreement to arbitrate. If so, the court should order arbitration. If not, arbitration should be refused.

K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d 752, 754. Accordingly, in New Mexico, parties entering a contract providing for the resolution of disputes through arbitration are bound by their agreement to arbitrate.  See Christmas v. Cimarron Realty Co., 1982-NMSC-079, ¶¶ 7-10, 648 P.2d 788, 790.

### 3.  Public Policy Favoring Enforcement of an Arbitration Agreement.

"There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration."  Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1488-89 (10th Cir. 1994).   See Southland Corp. v. Keating, 465 U.S. 1, 10 (1984)("Congress declared a national policy favoring arbitration.");  Hill v. Ricoh Americas

Corp., 603 F.3d 766, 771 (10th Cir. 2010)("[T]he FAA is a 'congressional declaration of a liberal federal policy favoring arbitration agreements.'")(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24).  Congress enacted the FAA with the express purpose of granting arbitration agreements the same enforceability as any other contract provision.  See Volt Info. Sciences, Inc. v. Bd. of Trs., 489 U.S. 468, 474 (1989)(stating that Congress designed the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and place such agreements upon the same footing as other contracts.").  When the applicability of arbitration is in dispute, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24-25).  New Mexico state courts also view arbitration as a "highly favored" method of resolving disputes, "in part because '[i]t promotes both judicial efficiency and conservation of resources by all parties.'"  Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 5, 107 P.3d 11, 13 (alteration original).  See Cornoyer v. AT&T Mobility Servs., LLC, 2016 WL 6404853, at *8.

### 4.     Existence of a Valid Arbitration Agreement.

The Supreme Court of the United States of America has noted that "[a]rbitration is simply a matter of contract between parties; it is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration."  First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995)(internal citations omitted).  Courts must interpret arbitration clauses liberally, and all doubts must be resolved in favor of arbitration.  See Hicks v. Cadle, Co., 355 F. App'x 186, 192 (10th Cir. 2009)("We resolve any doubts in favor of arbitrability.")(citing Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 209 (1991)); Armijo v.

Prudential Ins. Co., 72 F.3d 793, 797-98 (10th Cir. 1995)(stating that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration" and that "arbitration clauses must be interpreted liberally, and any doubts should be resolved in favor of arbitration," and holding that the plaintiffs had "failed to rebut the presumption of arbitrability.").

While "the presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration agreement, . . . this presumption disappears when the parties dispute the existence of a valid arbitration agreement." Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002). See Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir. 1998)("When the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away."). In the Tenth Circuit, and in the courts of New Mexico, the "existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." Avedon Eng'g Inc. v. Seatex, 126 F.3d 1279, 1287 (10th Cir. 1997). See K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d at 754 (stating that "the courts only decide the threshold question of whether there is an agreement to arbitrate. If so, the court should order arbitration."). "Like other contracts . . . [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 68 (quoting Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)). Cf. K.L. House Construction Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d at 754 (holding that because a valid arbitration clause existed, the parties had to arbitrate all disputes when the "subject matter of the dispute has a reasonable relationship to the subject matter of the contract"). See Cornoyer v. AT&T Mobility Servs., LLC, 2016 WL 6404853, at *8-11.

5.      **Consideration and Illusory Arbitration Agreements**.

"To determine whether the agreement to arbitrate is valid, courts look to general state contract law, with the caveat that state laws that are specifically hostile to arbitration agreements are preempted by the FAA." Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 8, 90 P.3d 466, 469 (citations omitted).  "It is for the trial court, and not the arbitrator, to decide whether a valid agreement to arbitrate exists." Sisneros v. Citadel Broad. Co., 2006-NMCA-102, ¶ 13, 142 P.3d 34, 39.  It is a fundamental tenet of contract law "that each party to a contract has a duty to read and familiarize himself with the contents of the contract, each party generally is presumed to know the terms of the agreement, and each is ordinarily bound thereby." Ballard v. Chavez, 1994-NMSC-007, ¶ 8, 868 P.2d 646, 648.  Under New Mexico law, "[a] legally enforceable contract requires evidence supporting the existence of an offer, an acceptance, consideration, and mutual assent." Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 6, 107 P.3d at 14 (internal quotation marks omitted).

"Consideration consists of a promise to do something that a party is under no legal obligation to do or to forbear from doing something he has a legal right to do." Talbott v. Roswell Hosp. Corp., 2005-NMCA-109, ¶ 16, 118 P.3d 194, 198.  "A valid contract must possess mutuality of obligation.  Mutuality means both sides must provide consideration." Heye v. Am. Golf Corp., 2003-NMCA-138, ¶ 12, 80 P.3d 495, 499.  Absent evidence of a "bargained-for exchange between the parties," an agreement lacks consideration and is unenforceable. Smith v. Vill. of Ruidoso, 1999-NMCA-151, ¶ 33, 994 P.2d 50, 58.  "Under general New Mexico contract law, an agreement that is subject to unilateral modification or revocation is illusory and unenforceable." Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469.  "This principle applies equally to agreements to arbitrate." Salazar v. Citadel Commc'ns

Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469.  The Supreme Court of New Mexico has concluded

that, if a party "reserves the right to change the agreement unilaterally, and at any time," the

party "has not really promised anything at all and should not be permitted to bind the other

party."  Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469.

       Several cases arising in New Mexico provide examples of illusory agreements to

arbitrate.   For instance, in Dumais v. American Golf Corp., 150 F. Supp. 2d 1182

(D.N.M. 2001)(Vazquez, J.), aff'd 299 F.3d 1216 (10th Cir. 2002), the United States District

Court for the District of New Mexico was asked to determine if an arbitration provision

contained in an employment handbook was enforceable, and precluded an employee from

bringing a claim for sexual harassment and constructive discharge under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e-2,  against her employer.  See 150 F. Supp. 2d at 1193.

The employer suggested that two documents which the employee executed when she became an

employee constituted a valid agreement to arbitrate such disputes.  See 150 F. Supp. 2d at 1193.

The documents included: (i) a form acknowledging that the employee had read and would abide

by the employer's arbitration program -- the "We Can Work It Out" program; and (ii) an

acknowledgment form that the employee would comply with the employment handbook and the

"We Can Work It Out" program.  See 150 F. Supp. 2d at 1193.  The Honorable Martha Vazquez,

United States District Judge for the District of New Mexico, concluded that the arbitration

agreement embodied in the "We Can Work It Out" program was illusory, because it was

executed over two months after the employee began her employment.  See 150 F. Supp. 2d at

1193.  The agreement also modified the terms of employment -- it divested the employee's right

to have disputes heard in an Article III court -- without consideration in return for that

divestiture.  See 150 F. Supp. 2d at 1193.  Judge Vazquez noted that inconsistent provisions in

the employment agreement made it unclear whether the arbitration agreement was binding on the employer, and therefore the potentially unilateral character of the promise to arbitrate made it illusory.  See 150 F. Supp. 2d at 1194.  The Tenth Circuit affirmed Judge Vazquez' holding in a de novo review on appeal.  See 299 F.3d at 1220.  In affirming Judge Vazquez, the Tenth Circuit stated: "We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."  299 F.3d at 1219.

Additionally, in Heye v. American Golf Corp., the Court of Appeals of New Mexico considered a question similar to the one that the federal court addressed in Dumais v. American Golf Corp.  See 2003-NMCA-138, ¶¶ 10-15, 80 P.3d at 499-500.  The Court of Appeals of New Mexico assessed the validity of an arbitration agreement in an employment contract that bound the employee, but not the employer, to arbitrate and that the employee signed after she was hired.  See Heye v. American Golf Corp., 2003-NMCA-138, ¶¶ 10-15, 80 P.3d at 499-500.  In finding that the agreement was illusory, the New Mexico Court of Appeals noted that the agreement permitted the employer to "amend, supplement, rescind or revise the policy regarding arbitration at its whim."  Heye v. American Golf Corporation, 2003-NMCA-138, ¶ 13, 80 P.3d at 499.  Although the employee was bound to arbitrate, the employer "remain[ed] free to selectively abide by its promise to arbitrate," and therefore the employer's "promise to arbitrate [did] not provide the consideration necessary to enforce the arbitration agreement."  Heye v. Am. Golf Corp., 2003-NMCA-138, ¶ 15, 80 P.3d at 500.

Next, in Piano v. Premier Distributing Co., the plaintiff worked as an administrative assistant for the defendant on an at-will employment basis.  See Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶¶ 2-3, 107 P.3d at 13.  During her employment, the defendant presented the

plaintiff with an arbitration agreement to sign, with the understanding that, if she did not sign it, the defendant would terminate her employment.  See Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶¶ 2-3, 107 P.3d at 13.  The plaintiff signed the agreement, and, later, when her employment was terminated, she brought suit against the defendant for wrongful termination; the defendant moved to compel arbitration.  See Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶¶ 2-3, 107 P.3d at 13.  On appeal of the district court's denial of the defendant's motion to compel arbitration, the Court of Appeals of New Mexico addressed whether an employer's promise of continued at-will employment constitutes sufficient consideration for an employee's promise to submit her claims to arbitration.  See Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶¶ 6-8, 107 P.3d at 14.  The Court of Appeals of New Mexico found that the employer's promise was illusory and explained: "The implied promise of continued at-will employment placed no constraints on Defendant's future conduct; its decision to continue Plaintiff's at-will employment was entirely discretionary."  Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 8, 107 P.3d at 14.

In Lumuenemo v. Citigroup, Inc., No. CIV 08-0830, 2009 WL 371901 (D. Colo. Feb. 12, 2009), the Honorable Wiley Y. Daniel, Chief United States District Judge for the District of Colorado, distinguished the facts in Piano v. Premier Distributing Co. from the facts in Lumuenemo v. Citigroup, Inc., stating:

> Plaintiff cites Piano v. Premier Distributing Co., 107 P.3d 11 (N.M. Ct. App. 2004), as support for her argument.  However, the holding in Piano turned on the fact that the plaintiff was an at-will employee prior to signing the arbitration agreement, and therefore, the implied promise of continued at-will employment did not constitute consideration.  Id. at 60.  Piano is distinguishable from the facts before this Court.  Here, Defendant's initial hiring of Plaintiff was conditioned on her consent to the terms of the Arbitration Agreement; thus, there was consideration in the form of employment.  Further, Defendant does need Plaintiff's approval -- Plaintiff had up to 30 days to contest any changes to the

Arbitration Agreement and/or to decide whether to continue employment based on such changes.  Moreover, the holding in <u>Piano</u> is not binding on this court.

<u>Lumuenemo v. Citigroup, Inc.</u>, 2009 WL 371901, at *5.

Further, in <u>Salazar v. Citadel Communications Corp.</u>, the Supreme Court of New Mexico held that, because Citadel Communications reserved the right to modify any provision of its employee handbook at any time, including the arbitration agreement contained therein, the agreement to arbitrate was "an unenforceable illusory promise."  <u>Salazar v. Citadel Communications Corp.</u>, 2004-NMSC-013, ¶ 16, 90 P.3d at 471.  In contrast, the Court of Appeals of New Mexico in <u>Sisneros v. Citadel Broadcasting Co.</u> found that the arbitration policy at issue restricted Citadel Broadcasting's right to terminate or amend the agreement to arbitrate, and thus, when Citadel Broadcasting terminated Sisneros' employment, Citadel Broadcasting was bound to arbitrate the dispute, just as Sisneros was bound to arbitrate, and therefore mutual obligation existed and the arbitration agreement was not illusory.  <u>See Sisneros v. Citadel Broadcasting Co.</u>, 2006-NMCA-102, ¶ 34, 142 P.3d at 43.  Similarly, in <u>Hardin v. First Cash Fin. Servs., Inc.</u>, 465 F.3d 470 (10th Cir. 2006), the arbitration agreement required the employer to provide ten-days' notice to its current employees before amending or terminating the arbitration agreement, and provided that the employer could not amend the agreement if it had actual notice of a potential dispute or claim, nor could it terminate the agreement as to any claims which arose before the termination date.  <u>See</u> 465 F.3d at 478.  The United States Court of Appeals for the Tenth Circuit, applying Oklahoma contract law, found that "[t]he [ ] limitations [were] sufficient to avoid rendering the parties' Agreement to arbitrate illusory."  <u>Hardin v. First Cash Fin. Servs., Inc.</u>, 465 F.3d at 478.  <u>See Pennington v. Northrop Grumman Space & Mission Sys. Corp.</u>, 269 F. App'x 812, 820 (10th Cir. 2008)(holding that "the reciprocal obligation to

arbitrate provides the requisite consideration.").  See Cornoyer v. AT&T Mobility Servs., LLC,

2016 WL 6404853, at *8.

### LAW REGARDING CONTRACT INTERPRETATION IN NEW MEXICO

In contract cases, "the role of the court is to give effect to the intention of the contracting

parties."  Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d 1184, 1190.  "The primary

objective in construing a contract is not to label it with specific definitions or to look at form

above substance, but to ascertain and enforce the intent of the parties as shown by the contents of

the instrument."  Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d at 1190 (citing

Shaeffer v. Kelton, 1980-NMSC-117, ¶ 8, 619 P.2d 1226, 1229).  "The parol evidence rule 'bars

admission of evidence extrinsic to the contract to contradict and perhaps even supplement the

writing.'"  Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 16, 12 P.3d 431,

437 (citation omitted).  If a contract is ambiguous, however, "evidence will be admitted to aid in

interpreting the parties' expressions."  C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-

070, ¶ 12, 817 P.2d 238, 242 (citation omitted).  "On the other hand, if the court determines that

the contract is clear and unambiguous on its face, evidence of the circumstances surrounding the

transaction is inadmissible to vary or modify its terms."  C.R. Anthony Co. v. Loretto Mall

Partners, 1991-NMSC-070, ¶ 12, 817 P.2d 238 (emphasis in original)(citation omitted).

The question whether an agreement contains an ambiguity is a matter of law.  See Mark

V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235 (citing Levenson v. Mobley,

1987-NMSC-102, ¶ 7, 744 P.2d 174, 176).  "An ambiguity exists in an agreement when the

parties' expressions of mutual assent lack clarity."  Mark V., Inc. v. Mellekas, 1993-NMSC-001,

¶ 12, 845 P.2d at 1235 (citation omitted).  If, however, the "evidence presented is so plain that no

reasonable person could hold any way but one, then the court may interpret the meaning as a

matter of law." Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235.   If, however, the court finds that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists." Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing Vickers v. North Am. Land Dev., Inc., 1980-NMSC-021, ¶¶ 9-10, 607 P.2d 603, 606).  New Mexico courts may consider extrinsic evidence to determine "whether the meaning of a term or expression contained in the agreement is actually unclear." Mark V., Inc., v. Mellekas, 1993-NMSC-001, ¶ 11, 845 P.2d at 1235.  See id., 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity."); C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 15, 817 P.2d at 242-43 ("We hold today that in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance.")(citation and footnote omitted).  Once the court finds that an ambiguity exists, the resolution of that ambiguity becomes a question of fact.  See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1235.  To decide any ambiguous terms' meaning, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent." Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1236.  See Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d 1157, 1184-85 (D.N.M. 2015)(Browning, J.).

## LAW REGARDING THIRD-PARTY BENEFICIARIES

As a general rule, "one who is not a party to a contract cannot maintain suit upon it." Fleet Mortgage Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d 81, 82.  Despite this general

rule, a third party may be a contract beneficiary, and may, as a beneficiary, have enforceable rights against another party to the contract.  See Fleet Mortgage Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d at 81. The Supreme Court of New Mexico has explained:

> A third-party may have an enforceable right against an actual party to a contract if the third-party is a beneficiary of the contract.  A third-party is a beneficiary if the actual parties to the contract intended to benefit the third-party.  The intent to benefit the third-party must appear either from the contract itself or from some evidence that the person claiming to be a third party beneficiary is an intended beneficiary.

Callahan v. N.M. Fed'n of Teachers-TVI, 2006-NMSC-010, ¶ 20, 131 P.3d 51, 58 (internal quotation marks and citations omitted).  See Great Am. Ins. Co. of N.Y. v. W. States Fire Prot. Co., 730 F. Supp. 2d 1308, 1316 (D.N.M. 2009)(Browning, J.).

## LAW REGARDING NEW MEXICO'S UNCONSCIONABILITY DEFENSE TO CONTRACT ENFORCEMENT

In New Mexico, "unconscionability is an affirmative defense to contract enforcement . . . ."  Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 3, 304 P.3d 409, 412.  Consequently, "[c]ourts may render a contract or portions of a contract unenforceable under the equitable doctrine of unconscionability when the terms are 'unreasonably favorable to one party while precluding a meaningful choice of the other party.'" Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 6, 385 P.3d 619, 621 (alteration added)(quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 21, 208 P.3d 901, 907).  See also N.M. Stat. Ann. § 55-2-302(1)("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.").  The party asserting an unconscionability defense "bears the

burden of proving that a contract or a portion of a contract should be voided as unconscionable." Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (citing Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶¶ 24, 39, 48, 304 P.3d at 415). "The burden of proving unconscionability refers only to 'the burden of persuasion, i.e., the burden to persuade the factfinder' and not 'the burden of production, i.e., the burden to produce evidence.'" Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (quoting Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 24, 304 P.3d at 415).

"A contract can be procedurally or substantively unconscionable." Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 21, 208 P.3d at 907). See Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 188 P.3d 1215, 1221 ("The classic articulation of unconscionability is that it is comprised of two prongs: substantive unconscionability and procedural unconscionability.")(citing 7 Joseph M. Perillo, Corbin on Contracts § 29.4, at 388 (2002 ed.)). "Substantive unconscionability relates to the content of the contract terms and whether they are illegal, contrary to public policy, or grossly unfair." Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 188 P.3d at 1221 (citing Padilla v. State Farm Mut. Auto. Ins. Co., 2003-NMSC-011, ¶ 14, 68 P.3d 901, 907; Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d 675, 679, disapproved of on other grounds by Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 31, 208 P.3d at 909). "Procedural unconscionability," by contrast, "is determined by analyzing the circumstances surrounding the contract's formation, such as whether it was an adhesive contract and the relative bargaining power of the parties." Fiser v. Dell Computer Corp., 2008-

NMSC-046, ¶ 20, 188 P.3d at 1221 (citing Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679).

"'The weight given to procedural and substantive considerations varies with the circumstances of each case.'" Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 188 P.3d at 1221 (quoting Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679). "While there is a greater likelihood of a contract's being invalidated for unconscionability if there is a combination of both procedural and substantive unconscionability, there is no absolute requirement in our law that both must be present to the same degree or that they both be present at all." Cordova v. World Fin. Corp. of NM, 2009-NMSC-021, ¶ 24, 208 P.3d at 908 (citing Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 22, 188 P.3d at 1221 (invalidating an arbitration clause without a finding of procedural unconscionability where "there has been such an overwhelming showing of substantive unconscionability"); Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679; 7 Joseph M. Perillo, Corbin on Contracts § 29.1, at 377 (ed. 2002)(observing that there is "no basis in the text" of Article 2 of the Uniform Commercial Code for concluding that the defense of unconscionability cannot be invoked unless the contract or clause is both procedurally and substantively unconscionable)). Moreover, "[p]rocedural and substantive unconscionability often have an inverse relationship[:] The more substantively oppressive a contract term, the less procedural unconscionability may be required for a court to conclude that the offending term is unenforceable." Cordova v. World Fin. Corp. of NM, 2009-NMSC-021, ¶ 24, 208 P.3d at 908 (alteration added)(citing Circuit City Stores, Inc. v. Mantor, 335 F.3d 1101, 1106 (9th Cir. 2003); 1 E. Allan Farnsworth, Farnsworth on Contracts § 4.28, at 585 (3d ed. 2004)("A court will weigh all elements of both substantive and procedural

unconscionability and may conclude that the contract is unconscionable because of the overall imbalance.")).

1.      **Procedural Unconscionability.**

"Procedural unconscionability may be found where there was inequality in the contract formation." State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d 658, 669 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 23, 208 P.3d at 907-08). A contract is procedurally unconscionable "only where the inequality is so gross that one party's choice is effectively non-existent." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 18, 709 P.2d at 679. See Bowlin's, Inc. v. Ramsey Oil Co., 1983-NMCA-038, ¶ 22, 662 P.2d 661, 669 (concluding that a contract may be unconscionable if there is "'an absence of meaningful choice on the part of one of the parties'")(quoting Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449 (D.C. Cir. 1965)(Wright, J.). Whether a party has meaningful choice is "determined by examining the circumstances surrounding the contract formation[], including the particular party's ability to understand the terms of the contract and the relative bargaining power of the parties." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679 (internal citations omitted). Consequently, "[a]nalyzing procedural unconscionability requires the court to look beyond the four corners of the contract and examine factors 'including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other.'" State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 27, 208 P.3d at 907-08). See City of Raton v. Arkansas River Power Auth., 760 F. Supp. 2d 1132, 1154 (D.N.M. 2009)(Browning, J)("In analyzing whether a contract or a term in a contract is procedurally unconscionable, New Mexico courts consider several factors, including

the use of high pressure tactics, the relative scarcity of the subject matter of the contract, and the relative education, sophistication and wealth of the parties.")(citing <u>Guthmann v. La Vida Llena</u>, 1985-NMSC-106, ¶ 16, 709 P.2d at 679).

"When assessing procedural unconscionability, courts should consider whether the contract is one of adhesion." <u>Rivera v. Am. Gen. Fin. Servs., Inc.</u>, 2011-NMSC-033, ¶ 44, 259 P.3d 803, 817.  An adhesion contract is a standardized contract that a transacting party with superior bargaining strength offers to a "weaker party on a take-it-or-leave-it basis, without opportunity for bargaining." <u>Rivera v. Am. Gen. Fin. Servs., Inc.</u>, 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (citing <u>Cordova v. World Fin. Corp. of N.M.</u>, 2009-NMSC-021, ¶ 33, 208 P.3d at 910).  "Adhesion contracts generally warrant heightened judicial scrutiny because the drafting party is in a superior bargaining position." <u>Rivera v. Am. Gen. Fin. Servs., Inc.</u>, 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (citing <u>Wis. Auto Title Loans, Inc. v. Jones</u>, 714 N.W.2d 155, 170 (Wis. 2006)).  "Although not all adhesion contracts are unconscionable, an adhesion contract is procedurally unconscionable and unenforceable 'when the terms are patently unfair to the weaker party.'" <u>Rivera v. Am. Gen. Fin. Servs., Inc.</u>, 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (quoting <u>Cordova v. World Fin. Corp. of N.M.</u>, 2009-NMSC-021, ¶ 33,  208 P.3d at 910).

For example, in <u>State ex rel. King v. B & B Investment Group, Inc.</u>, the Supreme Court of New Mexico decided whether loan contracts offered by certain payday lenders were unconscionable.  2014-NMSC-024, ¶ 27, 329 P.3d at 669-70.  The Supreme Court of New Mexico concluded that substantial evidence supported "the finding of procedural unconscionability as understood in common law." <u>State ex rel. King v. B & B Inv. Grp., Inc.</u>, 2014-NMSC-024, ¶ 27, 329 P.3d at 669-70  The Supreme Court of New Mexico predicated its

holding that the loan contracts at issue were procedurally unconscionable on a number of facts

regarding contract formation, including

> the relative bargaining strength and sophistication of the parties is unequal. Moreover, borrowers are presented with Hobson's choice: either accept the quadruple-digit interest rates, or walk away from the loan. The substantive terms are preprinted on a standard form, which is entirely nonnegotiable. The interest rates are set by drop-down menus in a computer program that precludes any modification of the offered rate. Employees are forbidden from manually overriding the computer to make fee adjustments without written permission from the companies' owners: manual overrides will be considered in violation of company policy and could result with . . . criminal charges brought against the employee and or termination.

State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (internal

quotation marks omitted).  The Supreme Court of New Mexico further concluded that, on these

facts, the payday loan contracts at issue were contracts of adhesion, because the "contracts are

prepared entirely by Defendants, who have superior bargaining power, and are offered to the

weaker party on a take-it-or-leave-it basis."  State ex rel. King v. B & B Inv. Grp., Inc., 2014-

NMSC-024, ¶ 27, 329 P.3d at 669.  The Supreme Court of New Mexico added that, "although

they will not be found unconscionable in every case, an adhesion contract is procedurally

unconscionable and unenforceable when the terms are patently unfair to the weaker party."  State

ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (citing Rivera v.

Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259 P.3d at 817).

By contrast, in Bowlin's, Inc. v. Ramsey Oil Co., Inc., the Court of Appeals of New

Mexico considered whether a clause requiring a retail gas company to notify its supplier of any

delivery shortages within two days of taking delivery was unconscionable.  See 1983-NMCA-

038, ¶ 23, 662 P.2d at 669.  The Court of Appeals of New Mexico addressed the party's

understanding, the contract's sophistication, and the possibility of coercion, and concluded that,

because the retailer fully understood the contract's term, and because "the contract was entered

into between experienced and sophisticated business concerns," there was no reason to find unconscionability.  Bowlin's, Inc. v. Ramsey Oil Co., Inc., 1983-NMCA-038, ¶ 23, 662 P.2d at 669 (internal quotation marks omitted).  The Court of Appeals of New Mexico also noted that unconscionability is more likely to sound as a defense where an individual consumer is concerned, explaining that "[t]he courts have not generally been receptive to pleas of unconscionability by one merchant against another."  Bowlin's, Inc. v. Ramsey Oil Co., Inc., 1983-NMCA-038, ¶ 21, 662 P.2d at 669 (internal citation omitted).  See Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, No. CIV 05-1331 JB/LCS, 2006 WL 4061187, at *9-10 (D.N.M. Sept. 12, 2006)(Browning, J.).

## 2.    Substantive Unconscionability.

 Substantive unconscionability requires courts "to consider 'whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar public policy concerns" to determine "the legality and fairness of the contract terms themselves.'"  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 621 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 22, 208 P.3d at 907).  Accordingly, when examining a contract for substantive unconscionability, courts must "examine the terms on the face of the contract and to consider the practical consequences of those terms."  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 621-22 (citing State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 32, 329 P.3d at 670 ("[S]ubstantive unconscionability can be found by examining the contract terms on their face.")).  "Thus, the party bearing the burden of proving substantive unconscionability need not make any particular evidentiary showing and can instead persuade the factfinder that the terms of a contract

are substantively unconscionable by analyzing the contract on its face." <u>Dalton v. Santander Consumer USA, Inc.</u>, 2016-NMSC-035, ¶ 8, 385 P.3d at 622.

"When its terms are unreasonably favorable to one party, a contract may be held to be substantively unconscionable." <u>Monette v. Tinsley</u>, 1999-NMCA-040, ¶ 19, 975 P.2d 361, 365 (citing <u>State ex rel. State Highway Transp. Dep't v. Garley</u>, 1991-NMSC-008, 806 P.2d 32, 39; <u>Guthmann v. La Vida Llena</u>, 1985-NMSC-106, 709 P.2d at 680). "However, the threshold for such a holding is very high, as the terms must be such as, no man in his senses and not under delusion would make on the one hand, and . . . no honest and fair man would accept on the other." <u>Monette v. Tinsley</u>, 1999-NMCA-040, ¶ 19, 975 P.2d at 365 (alteration original)(internal quotations omitted). The Supreme Court of New Mexico noted in <u>Guthmann v. La Vida Llena</u>:

> In determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. The terms are to be considered "in the light of the general commercial background and the commercial needs of the particular trade or case." Corbin suggests the test as being whether the terms are "so extreme as to appear unconscionable according to the mores and business practices of the time and place."

1985-NMSC-106, ¶ 23, 709 P.2d at 680 (quoting <u>Bowlin's, Inc. v. Ramsey Oil Co.</u>, 1983-NMCA-038, ¶ 22, 662 P.2d at 669 (quoting <u>Williams v. Walker-Thomas Furniture Co.</u>, 350 F.2d at 450)). Further, for a court to hold that a contract is substantively unconscionable, the court must conclude that one or more of the contract's terms was grossly unfair "at the time the contract was formed." <u>Guthmann v. La Vida Llena</u>, 1985-NMSC-106, ¶ 24, 709 P.2d at 680.

With respect to arbitration agreements specifically, the Supreme Court of New Mexico has held that arbitration agreements are substantively unconscionable and thus unenforceable where the arbitration agreement contains a unilateral carve out that explicitly exempts from mandatory arbitration those judicial remedies that a lender is likely to need, while providing no

such exemption for the borrower.  See Rivera v. American General Financial Services, Inc., 2011-NMSC-033, ¶¶ 51-54, 259 P.3d at 818-19; Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 32, 208 P.3d at 907-10.   In Cordova v. World Finance Corporation of New Mexico, for example, the Supreme Court of New Mexico stated that "[c]ontract provisions that unreasonably benefit one party over another are substantively unconscionable."  2009-NMSC-021, ¶ 25, 208 P.3d at 908.   In that case, a loan contract included a purportedly bilateral arbitration clause containing a unilateral carve-out provision that exempted the lender from mandatory arbitration when the lender sought remedies, "including[,] but not limited to, judicial foreclosure or repossession" in the event of a default by the borrower.  Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 3, 208 P.3d at 904 (internal quotation marks omitted).  The Supreme Court of New Mexico held that the arbitration clause was "grossly unreasonable" and against New Mexico public policy, because the agreement required require the borrower to arbitrate any of the borrower's claims while reserving to the lender "the exclusive option of seeking its preferred remedies through litigation."  Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 20, 208 P.3d at 907.  Accordingly, the Supreme Court of New Mexico held that the arbitration agreement was substantively unconscionable.  Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 32, 208 P.3d at 910.

Next, in Rivera v. American General Financial Services, Inc., the Supreme Court of New Mexico confronted a similar loan contract in which an arbitration agreement required the borrower to arbitrate any claims against the lender while exempting from mandatory arbitration the lender's "self-help or judicial remedies" concerning the property securing the transaction and any claims that the lender might have "[i]n the event of a default."  2011-NMSC-033, ¶ 3,  259 P.3d at 807-08.  As in Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 32, 208 P.3d at

- 53 -

910, in <u>Rivera v. American General Financial Services, Inc.</u>, the Supreme Court of New Mexico again held that an arbitration agreement is substantively unconscionable, because the arbitration clause allowed the lender to "retain[] the right to obtain through the judicial system the only remedies it [is] likely to need," while "forcing [the borrower] to arbitrate any claim she may have."  2011-NMSC-033, ¶ 53, 259 P.3d at 818-19.  Accordingly, the Supreme Court of New Mexico held that the arbitration agreement was unreasonably one-sided and, therefore, unenforceable qua substantively unconscionable.  <u>Rivera v. American General Financial Services, Inc.</u>, 2011-NMSC-033, ¶ 54, 259 P.3d at 818-19.

By contrast, in <u>Dalton v. Santander Consumer USA, Inc.</u>, the Supreme Court of New Mexico held that an arbitration agreement between a lender and a borrower that included a bilateral exception for small claims less than $10,000.00 was not substantively unconscionable, "even if one party is substantively more likely to bring small claims actions . . . ."  2016-NMSC-035, ¶ 21, 385 P.3d at 624.  <u>See</u> 2016-NMSC-035, ¶ 22, 385 P.3d at 625 ("We are hesitant to adopt a holding that might discourage bilateral small claims carve-outs, and thereby curtail the availability of small claims proceedings to New Mexico consumers . . . .").  The Supreme Court of New Mexico stated that "[g]ross unfairness is a bedrock principle of our unconscionability analysis," 2016-NMSC-035, ¶ 21; 385 P.3d at 624, and refused to conclude that an arbitration agreement that exempts, for both parties, claims less than $10,000.00 from mandatory arbitration is either unreasonably one-sided or grossly unfair, <u>see</u> 2016-NMSC-035, ¶¶ 21-25; 385 P.3d at 624-25.  <u>See also</u> <u>Thompson v. THI of New Mexico at Casa Arena Blanca, LLC</u>, 2006 WL 4061187, at *10.

<u>ANALYSIS</u>

By executing the Participating Provider Agreement, La Frontera entered an enforceable arbitration agreement with United Behavioral Health.  That agreement is neither unconscionable nor illusory.  Accordingly, the claims that La Frontera's asserts against United Behavioral Health in the First Amended Complaint are subject to mandatory arbitration.  Although neither United Healthcare Insurance nor Optumhealth is a signatory to the Participating Provider Agreement, La Frontera is estopped from avoiding arbitration of the claims it asserts against those United Health entities in light of (i) La Frontera's agreement to arbitrate disputes arising from its business relationship with United Behavioral Health; and (ii) the interdependence, if not the indistinguishability, of La Frontera's claims against United Behavioral Health and La Frontera's claims against United Healthcare Insurance and Optumhealth.  All of La Frontera's claims against the United Health Defendants, therefore, are subject to mandatory arbitration.  Accordingly, the Court stays proceedings pending the resolution of arbitration.

I.   **LA FRONTERA'S CLAIMS AGAINST UNITED HEALTH ARE SUBJECT TO ARBITRATION.**

In its First Amended Complaint, La Frontera asserts nine claims against United Health. The FAA and the NMUAA contemplate that a "written agreement to arbitrate in any contract . . . 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"  <u>Volt Info. Sciences, Inc. v. Bd. of Trs.</u>, 489 U.S. at 474 (quoting 9 U.S.C. § 2).  <u>See</u> <u>Murken v. Deutsche Morgan Grenfell, Inc.</u>, 2006-NMCA-080, ¶ 30, 139 P.3d 864, 855 (noting the NMUAA states "that an agreement to arbitrate is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract")(internal quotation marks omitted).  The Court must decide whether the Participating Provider Agreement's arbitration clause encompasses La Frontera's claims

against each of the United Health Defendants.  In other words, the Court must decide whether the

United Health Defendants and La Frontera agreed to submit La Frontera's claims to arbitration.

See Belnap v. Iasis Healthcare, 844 F.3d 1272, 1280 (10th Cir. 2017)("Because arbitration is

simply a matter of contract, . . . the arbitrability of the merits of a dispute depends upon whether

the parties agreed to arbitrate that dispute . . . .")(alterations added)(internal quotation marks and

citations omitted).

### A.   LA FRONTERA'S CLAIMS AGAINST UNITED BEHAVIORAL HEALTH ARE SUBJECT TO ARBITRATION.

Under the Participating Provider Agreement, La Frontera's nine claims against United

Behavioral Health are subject to arbitration.  "In deciding if a dispute is arbitrable, a court must

initially determine whether the arbitration provision is broad or narrow."  Newmont U.S.A. Ltd.

v. Ins. Co. of N. Am., 615 F.3d 1268, 1274 (10th Cir. 2010).  Accordingly, the Court carefully

analyzes the contractual language at issue.  See Newmont U.S.A. Ltd. v. Ins. Co. of N. Am., 615

F.3d at 1274.  The Participating Provider Agreement's arbitration clause provides in pertinent

part:

> It is agreed that prior to any other remedy available to the parties, UBH, Payor, and/or Provider shall provide written notice of any disputes or claims arising out of their business relationship (the "Dispute") to the other party within thirty (30) days of the final decision date, action, omission or cause from which the Dispute arose, whichever is later (the "Dispute Date"). . . . If the parties are unable to resolve the Dispute within thirty (30) days following receipt of the notice of Dispute, and if either UBH, Provider or Payor desires to pursue formal resolution of the Dispute, then said party shall issue a notice of arbitration to the other parties. . . .  Any arbitration proceeding under this Agreement shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association ("AAA"). . . .  The parties acknowledge that because this Agreement affects interstate commerce the Federal Arbitration Act applies.

Participating Provider Agreement § 7.1, at 11-12 (alterations added).  The Participating Provider

Agreement defines "UBH" as United Behavioral Health and "Provider" as the undersigned

facility provider -- here, La Frontera.   The Participating Provider Agreement also defines "Payor" as "[t]he entity or person that has the financial responsibility for funding payment of Covered Services on behalf of a Member, and that is authorized to access [Mental Health and Substance Abuse] Services in accordance with this Agreement" -- where (i) "Member" is "[a]n individual who is eligible for, properly enrolled in, and covered under" a plan of benefits for health care coverage, administered by United Behavioral Health directly or through its "Affiliate;" and (ii) where "Affiliate," in turn, is defined to include "[e]ach and every entity or business concern with which UBH, directly or indirectly, in whole or in part, either: (i) owns or controls; (ii) is owned or controlled by; or (iii) is under common ownership or control." Participating Provider Agreement at 1-3.

The Participating Provider Agreement's arbitration clause broadly encompasses "any disputes or claims arising out of" the "business relationship" between United Behavioral Health, La Frontera, and any "Payor."  Participating Provider Agreement § 7.1, at 11.  The Participating Provider Agreement's arbitration agreement creates "a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"  AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. at 650 (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960)). Accordingly, the Court resolves any doubts "'in favor of coverage.'"  AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. at 650 (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960)).  Where the arbitration agreement sweeps broadly, "[i]n the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration

can prevail." AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. at 650 (quoting

Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. at 584-85).  Because the Participating

Provider Agreement's arbitration clause not only sweeps broadly in its coverage, but also does

not expressly exclude any grievances from arbitration, La Frontera must present "forceful

evidence" that the arbitration agreement does not cover the claims it asserts in its First Amended

Complaint.  AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. at 650 (quoting

Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. at 585).  La Frontera cannot carry that

burden.  Each of La Frontera's claims asserted in the First Amended Complaint plainly arises out

of its "business relationship" with United Behavioral Health and the "Payor."   Participating

Provider Agreement § 7.1, at 11.

        In its Response, La Frontera argues that its claims against United Health arise not from

the Participating Provider Agreement, but from the agreement that La Frontera and HSD

executed, and from the Statewide Entity contract that United Health executed with the

Collaborative.  See Response at 10-11.  For example, La Frontera specifically contends that its

third-party beneficiary claim, promissory estoppel claim, and quantum meruit/unjust enrichment

claims do not arise from the Participating Provider Agreement, or any other written agreement

with United Health.  See Response at 11.  At the hearing, La Frontera pressed its argument that

its third-party beneficiary claim is not subject to arbitration, because that claim does not arise

under the Participating Provider Agreement.  See Tr. at 30:9-11 (Kolsrud).  La Frontera reasoned

that "the arbitration agreement is irrelevant to the third-party beneficiary claim."  Tr. at 30:11-12

(Kolsrud).

        La Frontera's argument regarding the scope of the Participating Provider Agreement's

arbitration clause is unavailing, because the arbitration clause does not limit its coverage to those

grievances arising from the Participating Provider Agreement; rather, the arbitration clause expressly extends to "any disputes or claims arising out of" the "business relationship" between United Behavioral Health, La Frontera, and the "Payor."   Participating Provider Agreement § 7.1, at 11.   La Frontera does not advert to any legal authority which generally states that an arbitration clause's scope is limited to claims or grievances arising from the same contract of which the arbitration clause forms a part.   See Response at 10-12.   Moreover, La Frontera's suggestion is unsound.   "Arbitration is a matter of contract," Zink v. Merrill Lynch Pierce Fenner & Smith, Inc., 13 F.3d 330, 332 (10th Cir. 1993), and parties therefore may agree to arbitrate more than just those disputes that arise out of the contract of which an arbitration clause forms a part, see Zink v. Merrill Lynch Pierce Fenner & Smith, Inc., 13 F.3d at 332 (citing Belke v. Merrill Lynch, Pierce, Fenner & Smith, 693 F.2d 1023, 1028 (11th Cir.1982)("An arbitration clause covering disputes arising out of the contract or business between the parties evinces a clear intent to cover more than just those matters set forth in the contract.")(emphasis in original)).

Nor does La Frontera rely on any of the Participating Provider Agreement's language that expressly limits the arbitration's scope to disputes arising out of the agreement.   See Response at 10-12.   For this reason, the Court concludes that La Frontera's reliance on CardioNet, Inc. v. Cigna Health Corp., 751 F.3d 165 (3d Cir. 2014), is unconvincing.   See Response at 11 (citing CardioNet, Inc. v. Cigna Health Corp., 751 F.3d at 172).   The arbitration agreement that was the subject of dispute in CardioNet, Inc. v. Cigna Health Corp. provided that "[d]isputes that might arise between the parties regarding the performance of interpretation of the Agreement must first be resolved through the applicable internal dispute resolution process," and, failing that, "either party can initiate arbitration."   751 F.3d at 173 (emphasis added)(internal citation omitted).

Unlike the arbitration agreement at issue in <u>CardioNet, Inc. v. Cigna Health Corp.</u>, the Participating Provider Agreement's arbitration clause does not limit its scope to grievances arising out of the Participating Provider Agreement.  Accordingly, unlike the United States Court of Appeals for the Third Circuit, the Court cannot "conclude that the arbitration clause in this case is limited in scope to disputes 'regarding the performance or interpretation of the Agreement.'"  <u>CardioNet, Inc. v. Cigna Health Corp.</u>, 751 F.3d at 174.  To the contrary, because it is faced with different contractual language that does not contain an analogous, express limitation, the Court concludes the opposite -- the Participation Provider Agreement's arbitration clause is not limited to grievances arising only out of the Participation Provider Agreement.

Each of La Frontera's claims asserted in the First Amended Complaint arises out of the business relationship between United Behavioral Health, La Frontera, and the "Payor."  The same conclusion is true for La Frontera's third-party beneficiary claim, which La Frontera specifically argued -- both in its papers and at the hearing -- was not subject to arbitration.  <u>See</u> Tr. at 30:9-12 (Kolsrud).  The Participating Provider Agreement's arbitration clause and La Frontera's First Amended Complaint, however, undermine La Frontera's argument.  In asserting its third-party beneficiary claim, La Frontera alleges that, "[a]t the time that La Frontera agreed to assist United in responding to its Behavioral Health Emergency in New Mexico, La Frontera was an intended third-party beneficiary of the Statewide Contract and the Amendments thereto between the United Entities and the Collaborative."  First Amended Complaint ¶ 131, at 31.  La Frontera also states that "[o]n or about July 8, 2013, La Frontera and United Behavioral Health executed the Participating Provider Agreement allowing La Frontera to supply services to United's Enrollees as a participating provider, and to be paid for those services by United."  First Amended Complaint ¶ 137, at 32.  La Frontera further avers that "[t]he primary purpose of the

money paid by the Collaborative to United was for United to reimburse the services supplied by

the Participating Providers [like La Frontera] to Enrollees."  First Amended Complaint ¶ 132, at

31.  Next, La Frontera states:

> Pursuant to the terms of the Statewide Contract, HSD and the Collaborative paid
> United $178 million from July through December 2013 to, among other things,
> pay La Frontera's claims for services.  In addition, at the time United terminated
> payments to 15 of its subcontracted providers, June 24, 2013, United held $18
> million designated to pay claims for services already rendered by United's
> terminated providers.  United agreed with the Collaborative to use that money to
> pay the claims for the Arizona providers, including La Frontera was an intended
> third-party beneficiary of the Collaborative/United agreements.  United refused to
> fulfill its obligation owed to La Frontera.

First Amended Complaint ¶ 139, at 32-33.

In considering United Health's Motion, the Court does not -- and must not -- consider the

merits of La Frontera's claims, including its third-party beneficiary claim.  See AT & T Techs.,

Inc. v. Commc'ns Workers of Am., 475 U.S. at 649 ("The third principle derived from our prior

cases is that, in deciding whether the parties have agreed to submit a particular grievance to

arbitration, a court is not to rule on the potential merits of the underlying claims.").  Without

considering the merits of La Frontera's third-party beneficiary claim, the Court concludes from

the First Amendment Complaint's face that this claim arises out of the "business relationship"

between United Behavioral Health, La Frontera, and a "Payor," Participating Provider

Agreement § 7.1, at 11.  Consequently, La Frontera's third-party beneficiary claim -- like all the

claims that La Frontera asserts against United Behavioral Health in its First Amendment

Complaint -- is subject to the broad sweep of the Participating Provider Agreement's arbitration

clause, because each claim arises out of a "business relationship" between United Behavioral

Health, La Frontera, and a Payor.  Participating Provider Agreement § 7.1, at 11.  See First

Amended Complaint ¶¶ 13-165, at 4-36.

- 61 -

### B.   LA FRONTERA'S CLAIMS AGAINST OPTUMHEALTH AND UNITED HEALTHCARE INSURANCE ARE SUBJECT TO ARBITRATION.

The Court next turns to the issue whether the Participating Provider Agreement's arbitration clause subjects the claims that La Frontera asserts against United Health Insurance and Optumhealth to arbitration.   This issue is distinct from whether La Frontera agreed to arbitrate claims against United Behavioral Health, because, unlike United Behavioral Health, Optumhealth and United Healthcare Insurance are not signatories to the Participating Provider Agreement.   See Participating Provider Agreement at 16.[3]

---

[3]The Court observes that, in the Participating Provider Agreement, La Frontera agreed to arbitrate "any disputes or claims arising out of [La Frontera's] business relationship" with United Behavioral Health and any "Payor."   Participating Provider Agreement § 7.1, at 11.   The Participating Provider Agreement defines a "Payor" to be "[t]he entity of person that has the financial responsibility for funding payment" of covered services that La Frontera provided to a United Health enrollee, Participating Provider Agreement at 3.   In its papers and at the hearing, United Health did not argue that, because United Healthcare Insurance is a "Payor" under the Participating Provider Agreement, La Frontera necessarily agreed to arbitrate its claims against United Healthcare Insurance.   Although the Court is aware that it must "resolve any doubts in favor of arbitrability," Hicks v. Cadle, Co., 355 F. App'x at 192 (10th Cir. 2009)(internal citation omitted), the Court will not make that argument for United Health, see Perry v. Woodward, 199 F.3d 1126, 1141 (10th Cir. 1999)("This court, however, will not craft a party's arguments for him").   The agreement refers to the possibility that United Behavioral Health could be a "Payor." Participating Provider Agreement ¶ 31, at 6.   That clause does not indicate, however, that United Behavioral Health and La Frontera agreed that "Payor" also refers to United Healthcare Insurance or Optumhealth.   Under their agreement, United Behavioral Health and La Frontera might have -- or even likely -- understood "Payor" to refer to New Mexico entities, such as HSD or the Collaborative, given the overarching role of HSD in La Frontera's agreement to provide services in New Mexico.   See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1236 ("[T]he fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent.").   The Court notes La Frontera's sustained emphasis at the hearing that its main agreement was with HSD and that HSD was the entity that ultimately paid La Frontera for services rendered in New Mexico. See Tr. at 13:14-14:14 (Kolsrud).

Accordingly, the Court will not conclude that the Participating Provider Agreement's arbitration clause binds La Frontera to arbitrate any claims against United Healthcare Insurance on the theory that United Healthcare Insurance is a "Payor" under the terms of the arbitration agreement.   Participating Provider Agreement § 7.1, at 11.   United Health did not make this argument before the Court, and the Court is not convinced that "Payor" refers to United Healthcare Insurance or Optumhealth instead of HSD or the Collaborative.   Accordingly, the

At the hearing, the Court sua sponte raised the issue whether United Healthcare Insurance and Optumhealth, as nonsignatories, could compel arbitration.  See Tr. at 12:6-8 (Court)(asking La Frontera whether it is "disputing that [the July 8, 2013, arbitration agreement] covers or doesn't cover United Healthcare Insurance Company, Inc.").  The Court noted that only United Behavioral Health and La Frontera executed the Participating Provider Agreement, and, therefore, queried (i) whether La Frontera entered into a contract with United Healthcare Insurance; and (ii) whether La Frontera agreed to arbitrate any grievances arising from a business relationship with United Healthcare Insurance.  See Tr. at 11:24-12:4 (Court).  See also Participating Provider Agreement at 16.  The Court did not give an inclined ruling at the hearing regarding these two issues, taking them under advisement.  See Tr. at 40:6-15 (Court).

### 1.   State Law Governs Whether a Nonsignatory to an Arbitration Agreement Can Be Bound By, or Compel Arbitration Under, That Agreement.

State law governs the issue whether a nonsignatory to an arbitration agreement can be bound by, or compel arbitration under, that agreement.  See Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630-31 (2009).  In Arthur Andersen LLP v. Carlisle, the Supreme Court explained:

> [S]tate law, therefore, is applicable to determine which contracts are binding under § 2 and enforceable under § 3 if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.  Because traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel, the Sixth Circuit's holding that nonparties to a contract are categorically barred from § 3 relief was error.

Arthur Andersen LLP v. Carlisle, 556 U.S. at 630-31 (emphasis original)(internal quotation marks and citations omitted).  Despite the Supreme Court's statement in Arthur Andersen LLP v.

---

Participating Provider Agreement's reference to "Payor" does not convince the Court that La Frontera expressly agreed to arbitrate its disputes with United Healthcare Insurance or Optumhealth.  Rather, for the reasons stated herein, the Court views United Healthcare Insurance and Optumhealth as nonsignatories to the Participating Provider Agreement.

Carlisle, 556 U.S. at 630-31, some federal courts remain uncertain that state law applies to whether a nonsignatory to an arbitration agreement is subject to, or may compel, arbitration under the agreement.  See DK Joint Venture 1 v. Weyand, 649 F.3d 310, 314 & n.4 (5th Cir. 2011).[4]   Indeed, before the Supreme Court decided Arthur Andersen LLP v. Carlisle, some federal courts ascribed to the view that federal law governs whether an arbitration agreement binds a nonsignatory.   See, e.g., Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 417 (4th Cir. 2000)("Because the determination of whether International Paper, a nonsignatory, is bound by the Wood–Schwabedissen contract presents no state law question of contract formation or validity, we look to the 'federal substantive law of arbitrability' to resolve this question.")(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24).  Nevertheless, in an opinion issued after Arthur Andersen LLP v. Carlisle, the Tenth Circuit clearly looked to state law, not federal common law, to determine whether nonsignatories to arbitration agreements can compel a signatory to arbitrate.  See Belnap v. Iasis Healthcare, 844 F.3d at 1293 ("To determine whether these Defendants can compel Dr. Belnap to arbitrate based on the arbitration provision of the Agreement -- an agreement that they never signed -- we

---

    [4] In DK Joint Venture 1 v. Weyand, the United States Court of Appeals for the Fifth Circuit refused to decide whether federal law or state law applies, because both bodies of law lead to the same conclusion; however, the court noted that in Wash. Mut. Fin. Grp., LLC v. Bailey, 364 F.3d 260, 267 n. 6 (5th Cir.2004), the court had stated that "'the federal substantive law of arbitrability' applies to the question of 'to what extent a non-signatory is bound by an arbitration provision contained in a contract she is suing under.'"  DK Joint Venture 1 v. Weyand, 649 F.3d 310, 314 & 314 n.4 (5th Cir. 2011).  See also Kingsley Capital Mgmt., LLC v. Sly, 820 F. Supp. 2d 1011, 1021-1023 (D. Ariz. 2011)(Wake, J.)(collecting cases and concluding that it is unclear whether Arthur Andersen "effected an Erie-like abrogation of federal law in favor of state law" or whether it merely "affirm[ed] the federal nature of the estoppel question, but only to the extent that the federal law tracks 'traditional principles of state law . . . .'").

look to Utah law.")(citing <u>Arthur Andersen LLP v. Carlisle</u>, 556 U.S. at 630-31).  The Tenth

Circuit's conclusion also reflects the Restatement position:

> There exists some disagreement among courts about whether federal common law or state contract law applies to determine whether a party is estopped from denying or has waived an objection to arbitral jurisdiction. Because issues of estoppel and waiver are often pled in the alternative to other related issues relating to formation and assent, the Restatement adopts the view that they are governed by state law.

Restatement (Third) U.S. Law of Int'l Comm. Arb. § 2-3 TD No 4 (2015).  Following the

Supreme Court and the Tenth Circuit, and informed by the Restatement, the Court concludes that

state law applies to whether, under ordinary contract doctrines, including the principle of

equitable estoppel, nonsignatories to arbitration agreements can compel a signatory to arbitrate.

Accordingly, New Mexico doctrines of contract and agency law determine (i) whether an

arbitration agreement binds a nonsignatory; and (ii) whether a nonsignatory can compel a

signatory to arbitrate the claims that the signatory asserts against the nonsignatory.

> ## 2.  <u>New Mexico Contract and Agency Principles Determine Whether a Nonsignatory to an Arbitration Agreement May Be Subject to, or May Compel, Arbitration Under That Agreement.</u>

The Supreme Court of New Mexico is the authority on New Mexico law regarding

whether a nonsignatory to an arbitration agreement can be bound by, or compel arbitration under,

that agreement.  See <u>C.I.R. v. Bosch's Estate</u>, 387 U.S. 456, 465 (1967)("[T]he same [choice of

law] principle [applied in diversity cases, see <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 78

(1938)] may be applied for the same reasons, viz., the underlying substantive rule involved is

based on state law and the State's highest court is the best authority on its own law.").  Upon

review, the Court concludes that the Supreme Court of New Mexico has not, however, spoken to

this issue.  Where the highest court of a state has not spoken on an issue that a federal court must

decide under state law, "federal authorities must apply what they find to be the state law after

giving 'proper regard' to relevant rulings of other courts of the State." C.I.R. v. Bosch's Estate, 387 U.S. at 465.  See id. at 465 ("In this respect, [a federal court] may be said to be, in effect, sitting as a state court.").   In this endeavor, the ruling of "'an intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'"  C.I.R. v. Bosch's Estate, 387 U.S. at 465 (alteration original)(quoting West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237 (1940)).   Accordingly, the Court also looks to the rulings of the Court of Appeals of New Mexico.  See C.I.R. v. Bosch's Estate, 387 U.S. at 465 (internal citations omitted).

The Court of Appeals of New Mexico has stated that, "[g]enerally, third parties who are not signatories to an arbitration agreement are not bound by the agreement and are not subject to, and cannot compel, arbitration."  Horanburg v. Felter, 2004-NMCA-121, ¶ 16, 99 P.3d 685, 689 (internal citations and quotation marks omitted).  The Supreme Court of New Mexico would likely apply this general rule.  Indeed, the Supreme Court of New Mexico's decision in Pueblo of Laguna v. Cillessen & Son, Inc., 1984-NMSC-060, ¶¶ 10-17, 682 P.2d 197, 199, offers an indication that, as a general matter, "third parties who are not signatories to an arbitration agreement are not bound by the agreement and are not subject to, and cannot compel, arbitration."  Horanburg v. Felter, 2004-NMCA-121, ¶ 16, 99 P.3d at 689 (internal citations and quotation marks omitted).  In Pueblo of Laguna v. Cillessen & Son, Inc., the Supreme Court of New Mexico held that the state district court erred in compelling consolidation of separate arbitration proceedings.  See 1984-NMSC-060, ¶ 17, 682 P.2d at 200.  In that case, Laguna Pueblo entered into separate arbitration agreements with "William G. Barber & Associates, Inc. (Barber) and Cillessen and Son, Inc. (Cillessen) to design and construct a health care facility."

1984-NMSC-060, ¶ 3, 682 P.2d at 198.   Laguna Pueblo petitioned for consolidation of arbitration proceedings against Cillessen and Barber.   See 1984-NMSC-060, ¶ 4, 682 P.2d at 198.   Looking to the terms of the respective contracts between Laguna Pueblo and Barber, and between Laguna Pueblo and Cillessen, the Supreme Court of New Mexico noted:

> [N]either the provisions quoted, nor any other clauses in either contract provide for the arbitration of disputes other than those arising between the parties to each contract. . . .   There is thus no privity or agreement to arbitrate between Barber and Cillessen.   There is also no evidence that the parties to each contract subsequently entered into an agreement to consolidate arbitration of disputes with third parties.

1984-NMSC-060, ¶ 13, 682 P.2d at 199-200 (alteration added).   The Supreme Court of New Mexico concluded, therefore, that "[t]he plain meaning of the contractual language here indicates that the parties did not contemplate consolidated arbitration.   The district court here could only enforce what the parties set out in their respective agreements."   1984-NMSC-060, ¶ 14, 682 P.2d at 200 (internal citations omitted).   The Supreme Court of New Mexico's conclusion that, under the respective contracts terms, the parties did not enter an agreement to consolidate arbitration with third parties supports the likelihood that Supreme Court of New Mexico would agree with the general rule which the Court of Appeals announced that "third parties who are not signatories to an arbitration agreement are not bound by the agreement and are not subject to, and cannot compel, arbitration."   Horanburg v. Felter, 2004-NMCA-121, ¶ 16, 99 P.3d at 689. Indeed, in Horanburg v. Felter, the Court of Appeals of New Mexico cited the Supreme Court of New Mexico's opinion in Pueblo of Laguna v. Cillessen & Son, Inc. for support.   See Horanburg v. Felter, 2004-NMCA-121, ¶ 16, 99 P.3d at 689 (citing Pueblo of Laguna v. Cillessen & Son, Inc., 1984-NMSC-060, ¶ 14, 682 P.2d at 200).

The general rule that nonsignatories to arbitration agreements are not subject to, and cannot compel, arbitration is not the complete statement of the law; there are exceptions.   The

Court concludes that the Supreme Court of New Mexico would likely add a proviso to the general rule that the Court of Appeals of New Mexico announced in <u>Horanburg v. Felter</u>, 2004-NMCA-121, ¶ 16, 99 P.3d at 689.  Under the proviso, third parties who are not signatories to an arbitration agreement are not subject to, and cannot compel, arbitration -- if and only if ordinary contract or agency doctrines do not establish a basis for a nonsignatory to be subject to, or to compel, arbitration.  <u>See</u> <u>Salazar v. Citadel Commc'ns Corp.</u>, 2004-NMSC-013, ¶ 8, 90 P.3d at 469 (stating that "courts look to general state contract law" to decide legal questions concerning arbitration agreements)(internal citations omitted).

Further, the Court concludes that the Supreme Court of New Mexico would recognize this proviso as a matter of New Mexico law, because it is recognized by the Court of Appeals of New Mexico.  In <u>Damon v. StrucSure Home Warranty, LLC</u>, the Court of Appeals of New Mexico observed that "there are exceptions to th[e] general rule [that nonparties to an arbitration rule are not subject to, and cannot compel, arbitration], including an exception for equitable estoppel."  <u>Damon v. StrucSure Home Warranty, LLC</u>, 2014-NMCA-116, ¶ 12, 338 P.3d 123, 126 (alterations added)(citing <u>Horanburg v. Felter</u>, 2004-NMCA-121, ¶¶ 16-17, 99 P.3d at 689).  Moreover, the proviso reflects the Restatement position:

> non-signatories may be bound by or entitled to invoke an arbitration agreement to the extent that they may be deemed to have assented to the arbitration agreement under ordinary principles of contract law, as well as other legal doctrines that operate legally to bind parties, particularly parties that share a corporate relationship. A range of theories and doctrines exist under which a non-signatory may be bound by or entitled to invoke an arbitration agreement.

Restatement (Third) U.S. Law of Int'l Comm. Arb. § 2-3 TD No 4 (2015).  Accordingly, the Court concludes that the Supreme Court of New Mexico would apply ordinary contract and

agency principles to determine if, despite the general rule, a nonsignatory is subject to, or can compel, arbitration.[5]

In sum, the Court believes that the Supreme Court of New Mexico would first apply the general rule that the Court of Appeals of New Mexico announced in Horanburg v. Felter, 2004-NMCA-121, ¶ 16, 99 P.3d at 689, that "third parties who are not signatories to an arbitration agreement are not bound by the agreement and are not subject to, and cannot compel, arbitration," see Pueblo of Laguna v. Cillessen & Son, Inc., 1984-NMSC-060, ¶ 14, 682 P.2d at 200.  The Court further concludes that the Supreme Court of New Mexico would also look to ordinary New Mexico contract and agency principles to determine whether, despite the general rule, a nonsignatory to an arbitration agreement may be subject to, or may compel, arbitration under that agreement.  See Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 8, 90 P.3d at

---

[5]For example, in deciding whether a nonsignatory to an arbitration agreement may be subject to, or may compel, arbitration, the Supreme Court of New Mexico would likely review the relevant contract terms to determine whether the nonsignatory is a third-party beneficiary of the arbitration agreement.  "A third party may be a beneficiary of such contract, and as a beneficiary may have an enforceable right against a party to a contract."  Fleet Mortg. Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d 81, 82 (internal citation omitted).  "Whether a party is a third-party beneficiary depends on if the parties to the contract intended to benefit the third party."  Fleet Mortg. Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d 81, 82-83 (internal citation omitted).  "Such intent must appear either from the contract itself or from some evidence that the person claiming to be a third party beneficiary is an intended beneficiary."  Fleet Mortg. Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d 81, 83 (internal quotation marks and citation omitted).  The Court concludes that the Supreme Court of New Mexico would apply these contract principles regarding third-party beneficiaries to arbitration agreements, just as other appellate courts have done when applying similar contract principles.  See Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 8, 90 P.3d at 469 (stating that "courts look to general state contract law" to decide legal questions concerning arbitration agreements)(internal citations omitted).  See also Gibson v. Wal-Mart Stores Inc., 181 F.3d 1163, 1170 n.3 (10th Cir. 1999)("The fact that Brooks did not individually sign the Agreement does not preclude enforcement of the Agreement with respect to Gibson's claims against her because it is clear that Brooks was, at the very least, a third party beneficiary of the Agreement."); MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 946-47 (11th Cir. 1999)(explaining that a nonsignatory may enforce an arbitration agreement under a third party beneficiary theory when the parties to the agreement have agreed, upon the formation of their agreement, to confer the benefits thereof to the nonsignatory).

469 (stating that "courts look to general state contract law" to decide legal questions concerning arbitration agreements).  See also Arthur Andersen LLP v. Carlisle, 556 U.S. at 630-31 (noting that "traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel").

### 3. The Court Estops La Frontera from Avoiding Arbitration of Its Claims Against United Healthcare Insurance and Optumhealth.

The Court now applies these rules to this case.  Neither United Healthcare Insurance nor Optumhealth is a signatory to the Participating Provider Agreement.  See Participating Provider Agreement at 16.[6]  Hence, United Healthcare Insurance and Optumhealth must establish that traditional principles of New Mexico contract or agency law require La Frontera to arbitrate its claims against them.  Otherwise, the rule that the Court of Appeals of New Mexico announced in Horanburg v. Felter, 2004-NMCA-121, ¶ 16, 99 P.3d at 689, forecloses United Healthcare Insurance and Optumhealth's ability, as nonsignatories, to compel arbitration under the Participating Provider Agreement.

The Court holds that La Frontera may not avoid arbitration of the claims it asserts against United Healthcare Insurance and Optumhealth.  At the hearing, United Health argued that, even though United Healthcare Insurance is a nonsignatory to the Participating Provider Agreement,

---

[6]The Court notes that (i) neither United Healthcare Insurance nor Optumhealth executed the agreement, see Participating Provider Agreement at 16; (ii) the agreement's terms do not refer to either United Healthcare Insurance or Optumhealth, see Participating Provider Agreement at 1-16; (iii) the terms do not suggest that La Frontera entered an agreement with United Healthcare Insurance or Optumhealth, see Participating Provider Agreement at 1 ("THIS AGREEMENT is between United Behavioral Health ('UBH') and the undersigned facility provider [i.e. La Frontera]"); and (iv) the arbitration clause does not expressly indicate that La Frontera agreed to arbitrate claims against United Healthcare Insurance or Optumhealth, see Participating Provider Agreement § 7.1, at 11 (referring to United Behavioral Health as a "party" to the agreement, but not referring to either Optumhealth or United Healthcare Insurance).

La Frontera cannot avoid arbitration of La Frontera's claims against United Healthcare Insurance.  See Tr. at 24:20-25:9 (Park); id. at 31:15-32:9 (Park).  United Health argued that "if United Healthcare Insurance doesn't have access to the arbitration provision, they can't also have reciprocal obligations underneath the agreement . . . ."  Tr. at 24:20-25:9 (Park).  United Health further argued: "[t]he only relationship that [La Frontera has] with United Healthcare Insurance Company is . . . [based on their] relationship with Optumhealth New Mexico, . . . which is a subsidiary or a joint venture of United Healthcare Insurance Company . . . [T]hey're suing United Healthcare Insurance Company because it's a joint venture with . . . United Behavioral."  Tr. at 31:15-32:9 (Park).  The Court understands United Health's arguments to sound in the doctrine of equitable estoppel.

Several courts, including this Court, have outlined when a nonsignatory to an arbitration agreement may successfully rely on the doctrine of equitable estoppel to compel arbitration:

> estoppel will permit a non-signatory to compel arbitration in the following two circumstances: (1) when the signatory must rely on the terms of the agreement in asserting its claims against the non-signatory; and (2) where the signatory alleges substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.

THI of New Mexico at Vida Encantada, LLC v. Lovato, 848 F. Supp. 2d 1309, 1330 (D.N.M. 2012)(Vazquez, J.)(quoting MS Dealer Serv. Corp. v. Franklin, 177 F.3d at 947).  See Am. Bankers Ins. Grp., Inc. v. Long, 453 F.3d 623, 627 & n.3 (4th Cir. 2006); Thompson v. THI of New Mexico at Casa Arena, No. CIV 05-1331JB/LCS, 2008 WL 5999653, at *15 (D.N.M. Dec. 24, 2008)(Browning, J.)("In most cases . . . 'courts held that the parties were estopped from avoiding arbitration because they had entered into written arbitration agreements, albeit with the affiliates of those parties asserting the arbitration and not the parties themselves.'")(quoting Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir. 1995)).

Courts estop signatories from evading arbitration with a nonsignatory in the two aforementioned circumstances, because, "[o]therwise, 'the arbitration proceedings [between the two signatories] would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.'" MS Dealer Serv. Corp. v. Franklin, 177 F.3d at 947 (first alteration added, second alteration original)(quoting Sam Reisfeld & Son Import Co. v. S.A. Eteco, 530 F.2d 679, 681 (5th Cir. 1976)).   Indeed, "several circuits have prevented a signatory from avoiding arbitration with nonsignatories 'when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" E.I. duPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates, S.A.S., 197 F.R.D. 112, 127 (D. Del. 2000)(McKelvie, J.)(quoting Thompson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d at 779)(internal citations omitted), aff'd in part, appeal dismissed in part sub nom. E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187 (3d Cir. 2001).   See Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993)("[W]hen the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement.")(alteration added)(quoting J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir. 1988)); Murken v. Suncor Energy, Inc., 2005-NMCA-102, ¶ 10, 117 P.3d 985, 988-89 ("'[T]he [federal Courts of Appeal] have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'")(alteration added)(emphasis in original)(quoting Thompson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d at 779).

The Court concludes that the Supreme Court of New Mexico would recognize that a nonsignatory to an arbitration agreement may successfully rely on the doctrine of equitable estoppel to compel arbitration.  First, as a result of the decisions of the federal Courts of Appeal, the Court of Appeals of New Mexico has "recognized . . . an exception for equitable estoppel  to the general rule that nonparties to an arbitration rule are not subject to, and cannot compel, arbitration.  Damon v. StrucSure Home Warranty, LLC, 2014-NMCA-116, ¶ 12, 338 P.3d at 126 (internal citations omitted).   See Horanburg v. Felter, 2004-NMCA-121, ¶¶ 16-17, 99 P.3d at 689-90 (citing Long v. Silver, 248 F.3d 309, 320 (4th Cir. 2001)(applying the "intertwined claims" test, among others, to hold that nonsignatory may invoke the arbitration clause); Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 527-28 (5th Cir. 2000)(upholding district court decision allowing nonsignatory to compel arbitration when complaint asserted tortious interference claims arising in part out of the agreement giving rise to the arbitration and asserted collusive and conspiratorial action on the part of the nonsignatories and a signatory); MS Dealer Serv. Corp. v. Franklin, 177 F.3d at 947 (holding that equitable estoppel allowed a nonsignatory to compel arbitration when the plaintiff's claims against the nonsignatory depended entirely upon a contractual obligation arising from the agreement containing the arbitration clause and alleged a collusive fraudulent scheme on the part of the signatory and nonsignatory); McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342, 344 (11th Cir. 1984)(recognizing that a nonsignatory may compel arbitration based on estoppel and the intertwined claims test)). Further, the Restatement reports that "courts at times permit nonsignatories to seek to compel signatories to arbitrate.  Use of the doctrine of equitable estoppel for these purposes occurs mainly in two circumstances," including "'when the signatory [to the contract containing the arbitration clause] raises allegations of … substantially interdependent and concerted misconduct

by both the nonsignatory and one or more of the signatories to the contract.'"  Restatement (Third) U.S. Law of Int'l Comm. Arb. § 2-3 TD No 4 (2015)(alterations original)(quoting MS Dealer Serv. Corp. v. Franklin, 177 F.3d at 947).

The estoppel exception applies in this case.  Optumhealth is a joint venture that United Behavioral Health and United Healthcare Insurance operate.    See Tr. at 10:20-23 (Kolsrud)("United Behavioral Health, Inc., is a corporation, United Healthcare Insurance Company, Inc., is a corporation.  And they do business in New Mexico as Optumhealth."); Tr. at 22:23-24 (Park)("Optumhealth New Mexico is a joint venture between United Behavioral and United Healthcare").[7]  In its First Amended Complaint, La Frontera asserted nine claims, and each claim refers to each entity associated with the joint venture -- United Behavioral Health, United Healthcare Insurance, and Optumhealth -- as "United."  First Amended Complaint ¶¶ 89-165, at 22-36.   Several of those claims rely on, or arise out of, the Participating Provider Agreement that United Behavioral Health and La Frontera executed.  See, e.g., First Amended Complaint ¶¶ 95, 97, 118, 137 at 24-25, 29, 32.  In its third-party beneficiary claim, for example, La Frontera alleges that "La Frontera and United Behavioral Health executed the Participating Provider Agreement allowing La Frontera to supply services to United's Enrollees as a participating provider, and to be paid for those services by United."  First Amended Complaint ¶ 137 at 32.   In light the corporate relationship between the United Health entities and the intertwined nature of La Frontera's claims against each, the Court prevents La Frontera from

---

[7]Under New Mexico law, a joint venture "is generally considered to be a partnership for a single transaction . . . ."  Wilger Enterprises, Inc. v. Broadway Vista Partners, 2005-NMCA-088, ¶ 10, 115 P.3d 822, 824.  "A joint venture is formed when the parties agree to combine their money, property or time for conducting a particular business venture and agree to share jointly in profits and losses, with the right of mutual control over the business enterprise or over the property."  Quirico v. Lopez, 1987-NMSC-070, ¶ 9, 740 P.2d 1153, 1155 (citing Fullerton v. Kaune, 1963-NMSC-078, ¶ 8, 382 P.2d 529, 532).

avoiding arbitration with United Healthcare Insurance and Optumhealth.  The claims that La

Frontera asserts against United Behavioral Health are inseparable from the claims that La

Frontera asserts against United Healthcare Insurance and Optumhealth.  See First Amended

Complaint ¶¶ 89-165, at 22-36.  Moreover, the claims that United Healthcare Insurance and

Optumhealth want to resolve in arbitration are intertwined with La Frontera's agreement to

arbitrate disputes arising from its "business relationship" with United Behavioral Health.

Participating Provider Agreement § 7.1, at 11.  La Frontera asserts "substantially interdependent

and concerted misconduct by both the nonsignator[ies -- United Healthcare Insurance and

Optumhealth] and one or more of the signatories [i.e. United Behavioral Health] to the contract."

MS Dealer Serv. Corp. v. Franklin, 177 F.3d at 947 (alterations added).  Accordingly, the Court

estops La Frontera from avoiding arbitration of each of its claims against Optumhealth and

United Healthcare Insurance, because those claims are interdependent with, if not indistinct

from, the disputes that La Frontera agreed to arbitrate -- namely, disputes arising from its

"business relationship" with United Behavioral Health.  Participating Provider Agreement § 7.1,

at 11.

In sum, the Court concludes that La Frontera entered an agreement to arbitrate every

claim that it asserts in the First Amended Complaint against United Behavioral Health.

Accordingly, the scope of the arbitration agreement extends to those claims in the First Amended

Complaint that La Frontera asserts against United Behavioral Health.  Further, the Court estops

La Frontera from avoiding arbitration of its claims against United Healthcare Insurance and

Optumhealth, because of (i) La Frontera's agreement to arbitrate disputes arising from its

business relationship with United Behavioral Health; and (ii) the interdependence, if not the

indistinguishability, of La Frontera's claims against United Behavioral Health and La Frontera's

- 75 -

claims against United Healthcare Insurance and Optumhealth.

## II. THE PARTICIPATING PROVIDER AGREEMENT'S ARBITRATION CLAUSE IS ENFORCEABLE, BECAUSE IT IS NEITHER UNCONSCIONABLE NOR ILLUSORY.

The Participating Provider Agreement's arbitration clause is enforceable, because it is neither unconscionable nor illusory.  In its Response and at the hearing, La Frontera argued that the Participating Provider Agreement's arbitration clause is unenforceable under New Mexico contract law, because it is both procedurally and substantively unconscionable and illusory.  See Response at 6-10; Tr. at 22:7-11 (Court, Kolsrud).   The arbitration agreement is neither unconscionable nor illusory.

### A. THE ARBITRATION AGREEMENT IS NOT PROCEDURALLY UNCONSCIONABLE.

First, the arbitration agreement is not unenforceable as procedurally unconscionable.  In considering whether a court should enforce a contract or a contract provision, the Supreme Court of New Mexico has suggested that the analysis of unconscionability should be placed in context, noting that "[t]he business condition under which [a] contract was formed directly affects the parties' relative bargaining power, reasonable expectations, and the commercial reasonableness of risk allocation as provided in the written agreement."  Ramirez-Eames v. Hover, 1989-NMSC-038, ¶ 9, 775 P.2d 722, 725.   Regardless of the context, however, contracts are presumed enforceable, and "[a]bsent unusual circumstances such as . . . unconscionability, a valid contract will be enforced, notwithstanding allegations that one party has received the better part of the bargain."  Ramirez-Eames v. Hover, 1989-NMSC-038, ¶ 4, 775 P.2d at 724.  See Drink, Inc. v. Martinez, 1976-NMSC-053, ¶ 11, 556 P.2d 348, 351 ("The doctrine of unconscionability was intended to prevent oppression and unfair surprise, not to relieve a party of a bad bargain.").  A contract is procedurally unconscionable "only where the inequality is so gross that one party's

choice is effectively non-existent." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 18, 709 P.2d at 679. Whether a party has meaningful choice is "determined by examining the circumstances surrounding the contract formation, including the particular party's ability to understand the terms of the contract and the relative bargaining power of the parties." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679 (internal citations omitted). Consequently, "[a]nalyzing procedural unconscionability requires the court to look beyond the four corners of the contract and examine factors 'including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other.'" State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 23, 208 P.3d at 907-08). Where a contract is "entered into between experienced and sophisticated business concerns," it is unlikely that the contract is infected by procedurally unconscionability. Bowlin's, Inc. v. Ramsey Oil Co., Inc., 1983-NMCA-038, ¶ 23, 662 P.2d at 669 (internal quotation marks omitted). "[C]ourts have not generally been receptive to pleas of unconscionability by one merchant against another." Bowlin's, Inc. v. Ramsey Oil Co., Inc., 1983-NMCA-038, ¶ 21, 662 P.2d at 669 (internal citation omitted).

In a nutshell, La Frontera's procedural unconscionability argument is that it had to execute the Participating Provider Agreement to receive payment for its services, because HSD and United Health agreed that the funding stream from HSD to subcontracting providers would run through United Health. See Response at 8-9. La Frontera contends that it was presented with a Hobson's choice: either it would operate in New Mexico pursuant to a deal in which La Frontera's funding was channeled from HSD through United Health pursuant to the terms of a Participating Provider Agreement with United Health or it would not be paid to operate in New

Mexico.  In other words, United Health presented to La Frontera a "take-it-or-leave-it" deal regarding how La Frontera would be paid for its New Mexico operations.  To be sure, under New Mexico contract law, a standardized contract offered by a party with superior bargaining strength to a weaker party on a take-it-or-leave it basis, without opportunity for bargaining, raises judicial scrutiny.  Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 33, 208 P.3d at 910).  Even then, not all adhesion contracts are unconscionable under New Mexico law.  See Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 33, 208 P.3d at 910); Guthmann v. LaVida Llena, 1985-NMSC-106, ¶¶ 17-21, 709 P.2d at 679-80 (holding that a contract "presented in a standardized printed form on a 'take-it-or-leave-it' basis" was not procedurally unconscionable).

La Frontera's Hobson-choice argument is insufficient to demonstrate that the Participating Provider Agreement is procedurally unconscionable -- i.e., that the inequality between United Health and La Frontera with respect to contract formation was so gross that La Frontera effectively had no choice but to execute the agreement.  See Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 18, 709 P.2d at 679.  La Frontera is a sophisticated entity.  According to its Annual Report for Fiscal Year 2012-2013, La Frontera served 16,483 clients and had $52,132,233.00 in total revenue.  See La Frontera Annual Report for Fiscal Year 2012-2013 at 6-7, http://lafronteraaz.org/wp-content/uploads/2014/11/Annual-Report-FY-12-13-FINAL.pdf. Any party with over $52 million in annual revenue is not, at least in New Mexico, a party that ordinarily successfully asserts the contract defense of procedural unconscionability.  See Guthmann v. LaVida Llena, 1985-NMSC-106, ¶ 21, 709 P.2d at 680 ("Consumers who successfully assert unconscionability usually are poor or otherwise disadvantaged.  Businessmen

and middle-class purchasers are not ordinarily victims of the kinds of gross advantage-taking that constitute unconscionability.")(internal citation omitted).   Moreover, La Frontera has not produced evidence of high-pressure tactics that effectively negated its choice to enter an agreement with United Health.   Rather, La Frontera purposefully entered the Participating Provider Agreement to receive payments for its services, and it understood that payment would flow from HSD through United Health.   See Tr. at 10:21-24 (Kolsrud)(explaining that a deal point was to secure a funding stream from HSD to La Frontera through United Health).   La Frontera has not presented sufficient evidence to demonstrate that it had no, or grossly unequal, bargaining power in this state of contract negotiation with United Health.   Further, although La Frontera states that "neither La Frontera nor United [Health] paid any attention to the terms of the [Participating Provider Agreement]," Response at 8, La Frontera cannot credibly argue that it did not realize that it was entering into an arbitration agreement with United Behavioral Health. On the last page of the Participating Provider Agreement, directly above the signature line, the contract emphasizes: "**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION THAT MAY BE ENFORCED BY THE PARTIES.**"   Participating Provider Agreement at 16 (emphasis in original).

La Frontera is a sophisticated entity with bargaining power that made a business decision to operate in New Mexico.   La Frontera effectuated its choice to operate in New Mexico by assenting to an arrangement with United Health that HSD's payment for La Frontera's services would flow from HSD through United Health.   La Frontera's agreement with United Health emphasized that it contained a mandatory arbitration clause.   See Participating Provider Agreement at 16.   Accordingly, the Court concludes that the Participating Provider Agreement's arbitration clause is not procedurally unconscionable.

**B.     THE ARBITRATION AGREEMENT IS NOT SUBSTANTIVELY UNCONSCIONABLE.**

Second, the arbitration agreement is not unenforceable as substantively unconscionable. Substantive unconscionability requires courts "to consider 'whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar public policy concerns" to determine "the legality and fairness of the contract terms themselves.'" Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 621 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 22, 208 P.3d at 907). Accordingly, when examining a contract for substantive unconscionability, courts must "examine the terms on the face of the contract and . . . consider the practical consequences of those terms." Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 621-22 (citing State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 32, 329 P.3d at 670 ("[S]ubstantive unconscionability can be found by examining the contract terms on their face.")).

Under New Mexico contract law, an arbitration agreement is substantively unconscionable if it contains a unilateral carve-out that explicitly exempts from mandatory arbitration those judicial remedies that the drafting party with superior bargaining power is likely to need, while providing no such exemption for the non-drafting party with inferior bargaining power. See Rivera v. American General Financial Services, Inc., 2011-NMSC-033, ¶¶ 53-54, 259 P.3d at 818-19; Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 32, 208 P.3d at 907-10. By contrast, an arbitration agreement that contains a bilateral carve-out that explicitly excludes from mandatory arbitration a certain set of claims is not substantively unconscionable, even if the party with superior bargaining power is more likely to assert the excluded claims in a judicial forum. See Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 21, 385 P.3d at 624 (holding that an arbitration agreement between a lender and a borrower that included a

bilateral exception for claims less than $10,000 was not substantively unconscionable, "even if one party is substantively more likely to bring small claims actions . . . .").

The Participating Provider Agreement's arbitration clause is wholly bilateral.   See Participating Provider Agreement § 7.1, at 11.   The arbitration agreement subjects to mandatory arbitration any disputes or claims of either La Frontera or United Behavioral Health "arising out of their business relationship."   Participating Provider Agreement § 7.1, at 11.   La Frontera acknowledges that "the terms of the arbitration provision may look fair and balanced."   Response at 9.   Despite conceding the bilateral nature of the arbitration agreement, La Frontera nevertheless argues that the agreement is substantively unconscionable, because "the most likely claim either party would ever file under the agreement would be a claim for damages by La Frontera for [United Health's] failure to pay."   Response at 9.   La Frontera asserts that, in the event of La Frontera's breach, United Health is unlikely to seek a judicial remedy, because United Health "can simply terminate the agreement and decline to allow La Frontera to continue providing services to Medicaid beneficiaries."   Response at 10.   In support of its argument, La Frontera relies on Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC.   Response at 10 (citing Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC., 2013-NMCA-077, 306 P.3d 480).   In that case, the Court of Appeals of New Mexico stated that "where a bi-lateral arbitration provision allow[s] some claims to be filed in court and reserved others for arbitration, the provision . . . is unconscionable because the claims most likely to arise for the entity were reserved for court while the most likely claims for the consumer were required to be arbitrated." Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, 2013-NMCA-077, ¶¶ 22-27, 306 P.3d at 489-90.   Based on Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, 2013-NMCA-077, ¶¶ 22-27, 306 P.3d at 489-90, La Frontera concludes that the Participating Provider

Agreement's arbitration clause, although completely bilateral, is nevertheless substantively unconscionable, because it is more likely that La Frontera asserts claims against United Health than vice-versa and, consequently, it is more likely that La Frontera's claims are subject to arbitration.  See Response at 9-10.

La Frontera's substantive unconscionability argument is unconvincing.  To begin, La Frontera's premise that it is the only party likely to assert claims and, hence, be subject to mandatory arbitration is unsound.  United Health could also plausibly assert claims against La Frontera arising out of their business relationship, and these claims would also be subject to mandatory arbitration.  It is plausible that United Health could assert claims for "recovery for overpayment" that United Health could make to La Frontera because of mistake or because of inaccurate or fraudulent billing submissions by La Frontera.  See Reply at 8.  The Court lacks a basis to speculate whether it is more likely that United Health or La Frontera will assert claims arising from their business relationship; however, without speculating, the Court concludes that either party -- not just La Frontera -- might assert claims, which would be subject to arbitration under their agreement.

Moreover, La Frontera's reliance on Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, 2013-NMCA-077, ¶¶ 22-27, 306 P.3d at 489-90, is misplaced.  In that case, the Court of Appeals of New Mexico concluded that an arbitration agreement was substantively unconscionable, because, although the agreement contained a bilateral exemption for certain claims from mandatory arbitration, it was significantly more likely that the drafting party, i.e., the nursing home operator, would avail itself of the exemption from mandatory arbitration than the non-drafting party, i.e., nursing home residents.  See Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, 2013-NMCA-077, ¶¶ 22-27, 306 P.3d at 489-90.  The Court of Appeals of

New Mexico reasoned that the arbitration agreement at issue was "unreasonably and unfairly one-sided in favor of Defendant," because even assuming that the exclusions to mandatory arbitration were available to either party, a "gross disparity . . . results from Defendant's reservation of its most likely claims to a judicial forum, while the resident's most likely claims are subject to arbitration." 2013-NMCA-077, ¶¶ 28-30, 306 P.3d at 491. The Court of Appeals of New Mexico gave a complete statement of its holding:

> While we agree that arbitration obligations do not have to be completely equal, and that parties may freely enter into reasonable agreements to exempt certain claims from arbitration, we refuse to enforce an agreement where the drafter unreasonably reserved the vast majority of his claims for the courts, while subjecting the weaker party to arbitration on essentially all of the claims that party is likely to bring. Defendant cannot avoid the equitable doctrine of unconscionability by drafting an agreement that reserves its most likely claims for a judicial forum, and provides some exemptions from arbitration to the resident so that there is some appearance of bilaterality, when that exemption is completely meaningless in practicality because the resident would rarely, if ever, raise that type of claim against the nursing home.

2013-NMCA-077, ¶ 30, 306 P.3d at 491 (internal citations omitted).

The Court of Appeals of New Mexico's holding in Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, 2013-NMCA-077, ¶¶ 28-30, 306 P.3d at 491, does not provide the Court with sound reason to conclude that the Participating Provider Agreement's arbitration clause is substantively unconscionable. Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC did not hold that an arbitration agreement is substantively unconscionable because one party is more likely to assert any claims and, thus, be subject to arbitration, see 2013-NMCA-077, ¶¶ 28-30, 306 P.3d at 491; rather, the Court of Appeals of New Mexico's holding was predicated on a bilateral exclusion from mandatory arbitration that had effect of channeling the non-drafting party's most likely claims to arbitration, while preserving the drafting party's ability to assert its most likely claims in a judicial forum, see Figueroa v. THI of New Mexico at Casa

Arena Blanca, LLC, 2013-NMCA-077, ¶¶ 28-30, 306 P.3d at 491.  The Participating Provider Agreement's arbitration clause, unlike the arbitration agreement in Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, does not exclude any sets of claims from mandatory arbitration, and, therefore, the Court of Appeals of New Mexico' holding is inapposite.  Further, even if Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC's holding were relevant, the parties subject to the arbitration agreement in that case -- a nursing home operator and nursing home residents -- are obviously disanalogous from the parties in in the instant case.

Moreover, Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, 2013-NMCA-077, ¶¶ 28-30, 306 P.3d at 491, is not good law, at least for the courts in the Tenth Circuit.  In THI of New Mexico at Hobbs Ctr., LLC v. Patton, 741 F.3d 1162, 1169 (10th Cir. 2014), held "that the FAA preempts the New Mexico law set forth in Figueroa."  THI of New Mexico at Hobbs Ctr., LLC v. Patton, 741 F.3d at 1169.  The Tenth Circuit explained:

> The rationale for the state unconscionability rule runs counter to Supreme Court precedent. A court may not invalidate an arbitration agreement on the ground that arbitration is an inferior means of dispute resolution. Common-law defenses to an arbitration demand are preempted by the FAA if they "derive their meaning from the fact that an agreement to arbitrate is at issue."  The rule of Figueroa derives its meaning from the fact that the agreement is an arbitration agreement because the heart of the asserted unfairness is the disparity in what claims must be arbitrated.

THI of New Mexico at Hobbs Ctr., LLC v. Patton, 741 F.3d at 1169 (emphasis original)(quoting AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1746 (2011)).  The Tenth Circuit's preemption analysis in THI of New Mexico at Hobbs Ctr., LLC v. Patton, 741 F.3d at 1169, applies mutatis mutandis to La Frontera's substantive unconscionability argument.  La Frontera's contends that the Participating Provider Agreement's arbitration clause is substantively unconscionable, because, under that agreement, La Frontera is more likely than United Health to arbitrate its claims.  See Response at 10 ("Although the arbitration provision appears to require

both parties to arbitrate any disputes, the only colorable dispute likely to be subject to the provision is a claim by La Frontera that United failed to pay.").  The unspoken but operative premise in La Frontera's argument is that arbitration is an inferior means of dispute resolution; therefore, in light of the FAA, the Court cannot conclude La Frontera's argument is sound.  See THI of New Mexico at Hobbs Ctr., LLC v. Patton, 741 F.3d at 1169 ("A court may not invalidate an arbitration agreement on the ground that arbitration is an inferior means of dispute resolution.").

Not only has the Tenth Circuit held that the FAA preempts the Court of Appeals of New Mexico's holding in Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC, but also, in Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 21; 385 P.3d at 624, the Supreme Court of New Mexico seemingly disavowed the Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC rule.  In Dalton v. Santander Consumer USA, Inc., the Supreme Court of New Mexico held that an arbitration agreement between a lender and a borrower that included a bilateral exception for small claims less than $10,000.00 was not substantively unconscionable, "even if one party is substantively more likely to bring small claims actions . . . ."  2016-NMSC-035, ¶ 21; 385 P.3d at 624.  Accordingly, the Court concludes that La Frontera's reliance on Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC is misplaced.  Even assuming that La Frontera is more likely to assert claims arising from its business relationship with United Behavioral Health and, hence, to arbitrate, the Participating Provider Agreement's arbitration clause is not substantively unconscionable.  See THI of New Mexico at Hobbs Ctr., LLC v. Patton, 741 F.3d at 1169; Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 21; 385 P.3d at 624.

## C.   THE ARBITRATION AGREEMENT IS NOT ILLUSORY.

The Participating Provider Agreement's arbitration clause is not illusory.  "Under general New Mexico contract law, an agreement that is subject to unilateral modification or revocation is illusory and unenforceable."  Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469.  "This principle applies equally to agreements to arbitrate."  Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469 (citing Heye v. Am. Golf Corp., 2003-NMCA-138, ¶¶ 11-12, 80 P.3d at 499).   "The party that reserves the right to change the agreement unilaterally, and at any time, has not really promised anything at all and should not be permitted to bind the other party."  Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469.

In its Response, La Frontera argues that the Participation Provider Agreement's arbitration clause was not a contract between itself and United Health, because the arbitration agreement between La Frontera and United Health was "not part of the deal" between La Frontera and HSD.  See Response at 6.   At the hearing, however, La Frontera retreated from its illusory argument:

> We did raise the illusory argument in our brief.  But that -- but that kind of got lost in the shuffle because the unilateral right that United has to make changes in the provider participation agreement did give us, La Frontera, an out.  They didn't like the change we had 30 days to submit a termination.  After reading the cases a second time, I wasn't as impressed with that argument as I was initially.

Tr. at 21:21-22:4 (Kolsrud).   United Health nevertheless contested La Frontera's illusory argument at the hearing, see Tr. at 26:1-14 (Park), and the Court acknowledged that La Frontera's illusory argument "is probably not [its] strongest argument . . . ," Tr. at 22:9-10 (Court).

In its papers, La Frontera does not provide a developed argument in support of its assertion that the Participating Provider Agreement's arbitration clause is illusory, see Response at 6; however, a review of the Participating Provider Agreement's terms regarding termination and amendment belies La Frontera's contention.  The arbitration agreement is not subject to United Health's unilateral modification or revocation.  Regarding amendment, Participating Provider Agreement § 9.1 provides that United Behavioral Health may amend the agreement by sending notice of amendment to La Frontera "at least 30 days prior to its effective date." Participating Provider Agreement § 9.1, at 13.  Further, Participating Provider Agreement § 9.1 allows for a Payor, such as HSD or the Collaborative, to amend the agreement, by providing:

> [I]f a Payor that is a governmental entity requires that certain provisions of this Amendment be removed, replaced, amended or that additional provisions be incorporated, such provisions shall be deemed to be removed, replaced, amended or additional provisions incorporated into this Agreement as of the effective date of such Payor requirement for all [Mental Health and Substance Abuse] Services provided which are subject to such Payor requirements without the signature of [La Frontera] being required.

Participating Provider Agreement § 9.1, at 13.  Regarding revocation, Participating Provider Agreement § 8.2(d) provides:

> This Agreement may be terminated as follows
>
> . . .
>
> (d) by either party, in the event of a material breach of this Agreement by the other party, upon 30 days prior written notice to the other party. . . .
>
> . . .
>
> (f) by [La Frontera] upon 60 days prior written to [United Behavioral Health] due to a unilateral amendment made to this Agreement pursuant to § 9.1 . . . .

Participating Provider Agreement § 8.2, at 12.

Under Participating Provider Agreement §§ 8.2 and 9.1, United Health could not amend and strike the arbitration agreement, and then immediately assert a claim against La Frontera in a judicial forum.  Participating Provider Agreement §§ 8.2 and 9.1, at 12-13.  Rather, if United Health sought to strike the arbitration clause, then, pursuant to § 9.1, United Behavioral Health would be required to provide La Frontera notice of amendment thirty days before initiating an amendment, and La Frontera would then have the option to terminate the agreement under § 8.2(f).  Participating Provider Agreement §§ 8.2 and 9.1, at 12-13.  Accordingly, the Participating Provider Agreement's arbitration agreement is not subject to United Health's unilateral modification or revocation.  The arbitration agreement is not "subject to unilateral modification or revocation" and, hence, is not "illusory and unenforceable."  Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469.

## III.    A STAY PENDING ARBITRATION IS APPROPRIATE.

The Court concludes that a stay pending arbitration of La Frontera's claims against the United Health Defendants is appropriate.  In the Motion, United Health requested that the Court stay the proceedings pending resolution of arbitration.  See Motion at 5.  FAA § 3 requires a stay of federal court proceedings pending arbitration:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  See Pre-Paid Legal Servs., Inc. v. Cahill, 786 F.3d 1287, 1289 (10th Cir. 2015).  Moreover, the Tenth Circuit has stated that "if a court concludes that parties agreed to arbitrate an issue, the court must stay litigation in favor of arbitration."  Belnap v. Iasis Healthcare, 844

F.3d at 1288 (citing <u>Williams v. Imhoff</u>, 203 F.3d 758, 764 (10th Cir. 2000)("Under the FAA, a 'court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'" (quoting <u>McMahan Sec. Co. v. Forum Capital Mkts. L.P.</u>, 35 F.3d 82, 85 (2d Cir. 1994))).

For the reasons set forth above, the Court concludes (i) that La Frontera and United Behavioral Health agreed to arbitrate the claims that La Frontera asserts against United Behavioral Health in the First Amended Complaint; (ii) that La Frontera's and United Behavioral Health's arbitration agreement is enforceable; and (iii) that La Frontera is estopped from avoiding arbitration of the claims it asserts against United Healthcare Insurance and Optumhealth.  FAA § 3, therefore, requires the Court to stay proceedings concerning La Frontera's claims against the United Health Defendants, because the Court is "satisfied that" those claims are "referable to arbitration" under the Participating Provider Agreement's arbitration clause.  9 U.S.C. § 3.

**IT IS ORDERED** that (i) the Defendants' Motion to Compel Arbitration, filed March 31, 2016 (Doc. 3), is granted; (ii) Plaintiff La Frontera must arbitrate the claims asserted against Defendants United Behavioral Health, Inc., United Healthcare Insurance Company, Inc., Optumhealth New Mexico d/b/a United Behavioral Health, Inc. in the First Amended Complaint, filed March 14, 2016 (Doc. 1-1); and (iii) proceedings over those claims are stayed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Russell A. Kolsrud
Dickinson Wright PLLC
Scottsdale, Arizona

-- and --

Gregory Moore
Dickinson Wright PLLC
Troy, Michigan

-- and --

Deborah E. Mann
Stefan R. Chacón
David H. Johnson
Montgomery & Andrews, P.A.
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Matthew W. Park
Lewis Roca Rothgerber Christie LLP
Las Vegas, Nevada

-- and --

John C. West
Lewis Roca Rothgerber Christie LLP
Phoenix, Arizona

   *Attorneys for the Defendants United Behavioral Health, Inc., United Healthcare Insurance Company, and Optumhealth New Mexico*